Albert John BUTTERFIELD and Angela Butterfield on behalf of Tiffany Ruth Butterfield, Plaintiffs and Petitioners,

v.

David OKUBO, Thomas Nickol, and Holy Cross Jordan Valley Hospital, Defendants and Respondents.

No. 900272.

Supreme Court of Utah.

April 7, 1992.

David Grindstaff, Salt Lake City, for the Butterfields.

R. Scott Williams and G. Eric Nielson, Salt Lake City, for Okubo.

Gary D. Scott and Michael A. Peterson, Salt Lake City, for Nickol.

David W. Slagle, Salt Lake City, for Holy Cross Jordan Hosp.

ZIMMERMAN, Justice:

This medical malpractice case is before us on a writ of certiorari to the court of appeals. Albert and Angela Butterfield sued Dr. Nickol, an emergency room physician, Dr. Okubo, a primary care physician, and Holy Cross Jordan Valley Hospital ("the Hospital"), charging that their failure to diagnose and treat the Butterfields' baby's breathing problems caused the child to die of sudden infant death syndrome. The district court granted summary judgment for defendants, finding that the Butterfields had not put forth legally sufficient evidence of breach of the standard of care or proximate cause.

The Butterfields appealed. The court of appeals found that the expert's affidavit submitted by the Butterfields demonstrated a question of fact as to the breach of the standard of care, but it affirmed the grant

of summary judgment on the ground that the affidavit was insufficient as to whether the doctors and the Hospital proximately caused the baby's death. *Butterfield v. Okubo*, 790 P.2d 94 (Utah Ct.App.1990).

We granted certiorari to determine whether the affidavit of the Butterfields' expert was sufficient to defeat summary judgment. We now reverse the court of appeals' holding that there was no issue of proximate cause. We therefore vacate the summary judgment and remand this case to the district court.

In reviewing a grant of summary judgment, we construe the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *E.g., Rollins v. Petersen*, 813 P.2d 1156, 1158 (Utah 1991); *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 636 (Utah 1989). We recite the facts in this case accordingly.

Tiffany Ruth Butterfield was born June 30, 1984, at Holy Cross Jordan Valley Hospital. Dr. Okubo examined Tiffany at birth and pronounced her healthy and normal. At that time, he observed no symptoms that indicated respiratory distress. Tiffany was discharged from the Hospital on July 1st. Three days later, the Butterfields brought Tiffany to the Hospital's emergency room, where Dr. Nickol was on duty. Mrs. Butterfield told Dr. Nickol that Tiffany was congested and having difficulty breathing. In her deposition testimony, Mrs. Butterfield said she also informed Dr. Nickol that Tiffany had turned blue and that on the way to the Hospital the Butterfields had had to "stimulate" her to catch her breath. However, on the emergency room record of the visit, neither Dr. Nickol nor the attending nurse mentioned a complaint of blue discoloration or the necessity to stimulate Tiffany in order to make her breathe.

Dr. Nickol examined Tiffany and found her to be normal and stable. Mrs. Butterfield testified in her deposition that Dr. Nickol and the nurse "sort of laughed" at the Butterfields' concerns and told them that Tiffany was simply developing her natural breathing pattern. At the conclusion of the visit, Dr. Nickol directed the Butterfields to monitor Tiffany's eating, defecation, and urination and to follow up with Dr. Okubo the next morning. Mrs. Butterfield initialed the emergency room record to verify that she had received the follow-up instructions.

Despite Dr. Nickol's follow-up instructions, the Butterfields did not take Tiffany to Dr. Okubo the next morning. Mrs. Butterfield testified that she telephoned Dr. Okubo that morning, but Dr. Okubo has no record or memory of the call. On July 16th, eleven days after they saw Dr. Nickol, the Butterfields took Tiffany to Dr. Okubo for a prearranged checkup. Dr. Okubo's office notes indicate that Tiffany was active and demanding, with good growth and development, but had a history of gasping. He noted that these gasps were not characterized by blue discoloration. In contrast, Mrs. Butterfield testified in her deposition that she told Dr. Okubo about Tiffany's July 4th breathing problems and said that she was worried that Tiffany's "color just wasn't right" and that the baby was "wheezing like she couldn't get her breath." Like Dr. Nickol, Dr. Okubo advised Mrs. Butterfield that Tiffany was developing her natural breathing pattern and told her not to worry about the baby.

One month later, Tiffany again suffered from breathing problems. Sometime after 8 p.m. on August 16th, the Butterfields noticed Tiffany "go limp and lose her breath." On the way to the Hospital's emergency room, Mrs. Butterfield patted and bounced the infant, finding that these motions stimulated Tiffany to breathe. Dr. Nickol was on duty at the Hospital. He checked Tiffany's lungs and abdomen, concluding again that Tiffany was establishing her natural breathing pattern and was in no danger. Because the emergency room nurse did not supply Dr. Nickol with the medical records of Tiffany's July 4th visit to the Hospital, it is unclear whether Dr. Nickol was aware that he had examined Tiffany for breathing difficulties once before.

Dr. Nickol's records and the nurse's notes of the August 16th visit indicate that Mrs. Butterfield was concerned that Tiffany had stopped breathing for four seconds, but both Dr. Nickol and the nurse recorded

that the episode was not accompanied by blue discoloration. After almost an hour, Dr. Nickol discharged Tiffany with instructions to the Butterfields to use a humidifier and bulb suction to relieve Tiffany's congestion, to monitor her for increased respiratory distress and blue discoloration, and to follow up with Dr. Okubo at the baby's two-month checkup or earlier if problems occurred.

Mrs. Butterfield never returned to Dr. Okubo. In her deposition, she said she decided to look for another doctor because she felt that Dr. Okubo was "careless" during her July 16th visit and that he and his nurse had rushed her and Tiffany "in one door and out the other" during the appointment. She likened his office to "an assembly line." By late August, the Butterfields had decided to take Tiffany to Dr. Monty McClellan, a family practitioner.

From then on, Dr. McClellan was Tiffany's primary, if not sole, physician. The Butterfields say they took Tiffany to the emergency room in early October and again saw Dr. Nickol, but Dr. Nickol claims he was not on duty that night. The Butterfields have produced no Hospital records to show that the third visit took place. From August to December 1984, Dr. McClellan saw Tiffany five times, on August 31st, September 27th, November 5th, November 30th, and December 14th. At no time during the five visits did the Butterfields inform Dr. McClellan of the episodes when Tiffany stopped breathing or turned blue. In her deposition, Mrs. Butterfield said that she did not tell Dr. McClellan about these episodes because Dr. Okubo and Dr. Nickol had convinced her that Tiffany was in no danger. Dr. McClellan gave the baby checkups and treated her for various ailments such as thrush, a whitish coating of the mouth, and congestion.

On December 20, 1984, Tiffany died of sudden infant death syndrome ("SIDS"). Two years later, on December 15, 1986, the Butterfields, acting on Tiffany's behalf, filed suit in Third District Court against Dr. Nickol, Dr. Okubo, and Holy Cross Jordan Valley Hospital.[1] The Butterfields charged that defendants' negligent and improper acts and diagnoses breached the standard of care they owed to Tiffany and proximately caused her death. Specifically, the Butterfields asserted that the doctors and the Hospital acted negligently in failing to prescribe a home apnea monitor, a device that would have alerted the parents if Tiffany had stopped breathing in her sleep. At a hearing before the trial court, the Butterfields acknowledged that the doctors were independent contractors and therefore that the Hospital was not liable for their actions, but alleged that the Hospital was liable for the negligence of the emergency room nurse, a Hospital employee, who on August 16th failed to provide Dr. Nickol with the record of Tiffany's first visit to the emergency room. The Butterfields made no claims against Dr. McClellan, who had been Tiffany's primary physician since late August of 1984.

Dr. Okubo, Dr. Nickol, and the Hospital moved for summary judgment. Dr. Okubo and Dr. Nickol submitted expert testimony in support of summary judgment, while the Butterfields submitted expert testimony to defeat the motion. Because the Butterfields' expert testimony is central to this opinion, we will discuss it in some detail.

The Butterfields submitted the affidavit of Dr. H. Barry Jacobs, a physician licensed in the state of Maryland. Based on his review of Tiffany's medical records, the Butterfields' depositions, and a conversation with Mr. Butterfield, Dr. Jacobs testified that "care below an acceptable standard was provided to Tiffany Butterfield by Dr. Nichol [sic], Dr. Okubo, and the Holy Cross Jordan Valley Hospial [sic]. . . ."

Dr. Jacobs' affidavit is composed of thirteen numbered paragraphs. Two paragraphs detail his qualifications and familiarity with the standards of care required of emergency room doctors, primary pediatricians, and managers of medical records. One paragraph describes the sources of the facts contained in the affidavit. One para-

---

**1.** The Butterfields' complaint also charged five "John Does" with negligence resulting in Tiffa-

ny's death. The John Does were never identified.

graph asserts that defendants' conduct fell below the standard of care; one paragraph asserts that this negligence proximately caused Tiffany's death; and one paragraph asserts that a home apnea monitor would have prevented Tiffany's death "to a reasonable degree of medical certainty." The remaining seven paragraphs list the facts that support Dr. Jacobs' conclusions. However, the affidavit makes no mention of Dr. McClellan's four months of intervening care between Tiffany's death and the last time she saw Dr. Nickol and Dr. Okubo.

The district court granted defendants' motions for summary judgment. The court held that the Butterfields had failed to establish through competent evidence or qualified expert testimony that the doctors or the Hospital breached the standard of care; that the Hospital was not liable for the alleged negligence of the nurse who failed to give Dr. Nickol the July 4th emergency room record because as a nurse she could not practice medicine and therefore was not held to the standard of care required of physicians; and that defendants' alleged misconduct did not proximately cause Tiffany's death because of "intervening events."

The court of appeals affirmed the district court's summary judgment, but reversed its finding that the Butterfields had failed to establish a genuine issue of material fact as to whether the doctors or the Hospital breached the standard of care. *Butterfield v. Okubo*, 790 P.2d 94, 97 (Utah Ct. App.1990). The court said that Dr. Jacobs' affidavit sufficiently claimed an expert's familiarity with the conduct required of emergency room physicians, primary care

pediatricians, and hospital record keepers. Therefore, the court concluded, Dr. Jacobs' opinion that defendants were negligent contradicted defendants' expert testimony that they were not negligent and created an issue of fact on the question of standard of care. *Id.*

However, the court of appeals also found that Dr. Jacobs' affidavit failed to establish the requisite causal link between defendants' actions and Tiffany's death, holding that "there is nothing in the Jacobs affidavit to indicate that the defendants' medical treatment proximately caused Tiffany's death, or even caused her death at all." *Id.* at 98. Because it believed that the Butterfields' expert failed to dispute defendants' contentions that they did not cause Tiffany's death, the court of appeals affirmed the district court's summary judgment in favor of defendants. *Id.*

■ Before this court, the Butterfields argue, inter alia, that the court of appeals erred in holding that Dr. Jacobs' affidavit failed to create a genuine issue of material fact as to causation.[2] We reverse the court of appeals' decision that Dr. Jacobs' affidavit did not create a genuine issue of material fact as to causation and remand to the district court for disposition in harmony with this opinion.

We first note the applicable standard of review. Summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Rollins v. Petersen*, 813 P.2d 1156, 1159 (Utah 1991); *Landes v. Capital City Bank*, 795 P.2d 1127, 1129 (Utah 1990); *Utah State Coalition of Sen-*

**2.** This is the Butterfields' sole complaint about the court of appeals' decision. However, most of their brief attacks the actions of the district court. The Butterfields' counsel's approach to briefing is not unique. Many lawyers, after a writ of certiorari has been granted, ignore the court of appeals' decision to which the writ applies and brief the correctness or incorrectness of the trial court ruling as though we were considering that ruling instead of the court of appeals'. In fact, on occasion, the briefs filed with this court appear to be only copies of those originally filed with the court of appeals. Given the relatively new existence of the court of ap-

peals and certiorari procedure in Utah, such an approach may be understandable, though wrong. But five years have passed since the court of appeals was created. We take this opportunity to remind the bar that when exercising our certiorari jurisdiction granted by section 78-2-2(3)(a), we review a decision of the court of appeals, not of the trial court. *See* Utah Code Ann. § 78-2-2(3)(a). Therefore, the briefs of the parties should address the decision of the court of appeals, not the decision of the trial court. To restate the matter: We do not grant certiorari to review *de novo* the trial court's decision. *See* Utah R.App.P. 46.

*ior Citizens v. Utah Power & Light,* 776 P.2d 632, 634 (Utah 1989). Because summary judgment is granted as a matter of law rather than fact, we review for correctness the legal conclusions of both the trial court and the court of appeals. *Ward v. Richfield City,* 798 P.2d 757, 759 (Utah 1990); *Division of Consumer Protection v. Rio Vista Oil, Ltd.,* 786 P.2d 1343, 1347 (Utah 1990); *CECO Corp. v. Concrete Specialists, Inc.,* 772 P.2d 967, 969 (Utah 1989); *Madsen v. Borthick,* 769 P.2d 245, 247 (Utah 1988).

■ This case presents us with the following question of law: Did Dr. Jacob's affidavit create a genuine issue of material fact as to causation? If we answer in the negative, we must affirm the summary judgment, as the Butterfields will have failed to show a material factual dispute. To recover for medical malpractice, the plaintiff must produce expert testimony that the medical professional's negligence proximately caused the plaintiff injury. *See Nixdorf v. Hicken,* 612 P.2d 348, 354 n. 17 (Utah 1980); *Marsh v. Pemberton,* 10 Utah 2d 40, 44, 347 P.2d 1108, 1110 (1959), *overruled on other grounds, Swan v. Lamb,* 584 P.2d 814 (Utah 1978); *Huggins v. Hicken,* 6 Utah 2d 233, 238, 310 P.2d 523, 526 (1957). Only if Dr. Jacobs' affidavit establishes an issue of fact as to causation will it preclude summary judgment.

■ Because this issue depends on the proper standard for determining the sufficiency of an expert's affidavit, we begin with an examination of what an expert must include in an affidavit to withstand a motion for summary judgment. This determination turns on the relationship between the rule of civil procedure governing summary judgment and one of the rules of evidence governing expert testimony.

Rule 56(e) of the Utah Rules of Civil Procedure provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his [or her] response, by affidavits or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial.* If he [or she] does not so respond, summary judgment, if appropriate, shall be entered against him [or her].

Utah R.Civ.P. 56(e) (emphasis added). Utah's rule 56 is similar to the federal rule governing summary judgment. *See* Fed. R.Civ.P. 56. The relevant Utah rule of evidence is identical to its counterpart in the federal rules of evidence, from which it was adopted. Rule 705 of the Utah Rules of Evidence states:

> The expert may testify in terms of opinion or inference and give his [or her] reasons therefor *without prior disclosure of the underlying facts or data,* unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Utah R.Evid. 705 (emphasis added).

On first reading, these rules seem to conflict. While the summary judgment rule requires affidavits to set forth "specific facts" to thwart summary judgment, the expert witness rule allows an expert to testify "without prior disclosure of the underlying facts or data." It can be argued that rule 705 is an exception to rule 56. If so, the rules would allow experts to defeat a summary judgment motion through the bare assertion of an unsupported legal conclusion. However, we and numerous other courts have rejected any weakening of the summary judgment requirement for experts. This development is summarized below.

We begin with an overview of the relevant Utah law. Utah has long required nonexpert rule 56 affiants to enumerate the specific evidentiary facts in support of their conclusions. *See, e.g., Treloggan v. Treloggan,* 699 P.2d 747, 748 (Utah 1985) (per curiam); *Reagan Outdoor Advertising, Inc. v. Lundgren,* 692 P.2d 776, 779 (Utah 1984); *Webster v. Sill,* 675 P.2d 1170, 1172 (Utah 1983); *Norton v. Blackham,* 669 P.2d 857, 859 (Utah 1983); *Jones v. Hinkle,* 611 P.2d 733, 736 (Utah 1980); *Walker v. Rocky Mountain Recreation Corp.,* 29 Utah 2d 274, 279, 508 P.2d 538, 542 (1973); *Western States Thrift and*

*Loan Co. v. Blomquist,* 29 Utah 2d 58, 61, 504 P.2d 1019, 1021 (1972). In recent years, we have made clear that this standard also applies to a situation in which the affiant testifies as an expert. *See Williams v. Melby,* 699 P.2d 723, 725–26 (Utah 1985); *see also Gaw v. Department of Transp.,* 798 P.2d 1130, 1137 n. 10 (Utah Ct.App.1990), *cert. denied* (Jan. 11, 1991); *American Concept Ins. Co. v. Lochhead,* 751 P.2d 271, 274 (Utah Ct.App.1988).

For clarity's sake, we will discuss the *Williams* case in some detail. In *Williams,* we found that an expert's affidavit included sufficiently specific facts to defeat summary judgment. 699 P.2d at 726. *Williams* was a personal injury case stemming from a fall through a bedroom window. An architect's affidavit stated that the window's design created an unreasonable risk to an occupant's safety. The affidavit stated that the height and position of the apartment window and placement of the window sill at or below the knee of the average person increased the possibility that anyone who leaned into the window would lose his or her balance and fall twenty-five feet to the ground. Because the affidavit stated specific facts instead of merely reflecting the affiant's conclusions, we found that it was sufficient to raise an issue of fact as to whether negligence in the design, construction, or maintenance of the window created an unreasonable risk to the occupant's safety.[3] *Id.*

Utah is not alone in requiring experts' affidavits to include supporting factual bases for their opinions. Numerous federal courts have found that factually unsupported conclusions in affidavits are insufficient to withstand summary judgment. *See, e.g., United States v. Various Slot Machines on Guam,* 658 F.2d 697, 700–01 (9th Cir.1981); *Bieghler v. Kleppe,* 633 F.2d 531, 533–34 (9th Cir.1980); *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1267, 1278, 1281–82 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir. 1987), *cert. denied sub nom. Lombardi v.*

*Dow Chem. Co.,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); *Tabatchnick v. G.D. Searle Co.,* 67 F.R.D. 49, 55 (D.N.J. 1975). As the District of Columbia Circuit has observed:

> To hold that [the rules of evidence] prevent[ ] a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than [the plaintiff's expert's] theoretical speculations would seriously undermine the policies of Rule 56.... The position that an expert's opinion that lacks *any* credible support creates an issue of "fact" is clearly untenable.

*Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 & n. 27 (D.C.Cir.1977) (emphasis in original).

An examination of the history and purpose of rule 705 supports our holding that expert affidavits in opposition to summary judgment must contain factual support for the experts' conclusions. Before the adoption of rule 705's provision that experts could testify without disclosing the basis for their opinions, experts generally could testify only in response to hypothetical questions counsel posed to them at trial. 2 G. Joseph & S. Saltzburg, *Evidence in America: The Federal Rules in the States* § 54.3, at 2–3 (1987). The hypothetical question's cumbersome nature and potential for flagrant abuse eventually cast it into disrepute. As one contemporaneous commentator put it:

> "Its abuses have become so obstructive and nauseous that no remedy short of extirpation will suffice.... The hypothetical question, misused by the clumsy and abused by the clever, has in practice led to intolerable obstruction of truth. In the first place, it has artificially clamped the mouth of the expert witness, so that his answer to a complex question may not express his actual opinion on the actual case. This is because the question may be so built up and contrived by

---

**3.** Although *Williams* never explicitly identifies the architect as an expert, his occupation and the technical nature of his testimony, in addition to the fact that the plaintiff also submitted

the affidavit of a physician to explain the dizziness that caused the fall, justify an inference that the architect testified in his affidavit as an expert witness. *See Williams,* 699 P.2d at 725.

counsel as to represent only a partisan conclusion. In the second place, it has tended to mislead the jury as to the purport of actual expert opinion. This is due to the same reason. In the third place, it has tended to confuse the jury, so that its employment becomes a mere waste of time and a futile obstruction." Peter Schofield, Comment, *Criteria for Admissibility of Expert Opinion Testimony on Criminal Modus Operandi*, 1978 Utah L.Rev. 547, 562 n. 87 (quoting 2 *J. Wigmore on Evidence* § 686, at 812 (3d ed. 1940)); *see also* 2 G. Joseph & S. Saltzburg, § 54.3, at 2–3. To counteract these perversions, rule 705 permits experts to testify without responding to a hypothetical question. *Advisory Committee's Note*, Fed. R.Evid. 705 (reproduced in 11 *Moore's Federal Practice* § 705.01[3] (2d ed. 1989)).

■ Because the sole purpose underlying rule 705 is "to obviate the need to use hypothetical questions to elicit expert opinion," 2 G. Joseph & S. Saltzburg, § 54.3, at 2, we conclude that the rule's drafters did not intend to exempt expert affidavits in opposition to summary judgment from rule 56(e)'s requirement that affidavits set forth specific facts showing there is a genuine issue for trial.[4] We therefore follow the path laid in *Williams* to the explicit holding that affidavits must include not only the expert's opinion, but also the specific facts that logically support the expert's conclusion. *See Williams v. Melby*, 699 P.2d 723 (Utah 1985). In so doing, we stress the requirement that rule 56(e) requires *specific* facts. Contrary to the Utah Court of Appeals' statement in *American Concept Insurance Co. v. Lochhead*, 751 P.2d 271, 274 (Utah Ct.App.1988), a bare assertion that the expert has reviewed the facts and based his or her opinion on them will *not* suffice.

Having established the standard for expert affidavits, we now turn to the merits of this case: whether Dr. Jacobs' affidavit

included sufficiently specific facts concerning causation so as to preclude summary judgment. Before we can consider whether Dr. Jacobs sufficiently averred proximate cause, we first must identify the alleged negligence itself. The court of appeals held that Dr. Jacobs' affidavit created a dispute over whether defendants had breached the standard of care required of emergency room physicians, primary care physicians, and managers of medical records. Defendants have not appealed this conclusion. However, the court of appeals failed to identify the specific acts or omissions Dr. Jacobs deemed negligent. Because we cannot determine whether Dr. Jacobs sufficiently averred a causal link between defendants' purported negligence and Tiffany's death without knowing what negligence Dr. Jacobs identified, we will examine Dr. Jacobs' affidavit for specific allegations of negligence before we turn to the question of causation.

■ Our review of the affidavit reveals three factual issues concerning breach of the standard of care. First, Dr. Jacobs states that the emergency room nurse's failure to produce the records from Tiffany's August 16th examination breached the standard of care for managers of medical records. Such a breach exposes the Hospital to respondeat superior liability.

Second, he states that if the Butterfields' deposition testimony is true, Dr. Okubo and Dr. Nickol were negligent in their record keeping because they failed to record the parents' observations that blue discoloration—an indicator of critical, potentially lethal respiratory distress—had accompanied Tiffany's breathing difficulties. He also faults Dr. Nickol for not recording cardiac findings during his August 16th exam.

Third, he states that a reasonable physician would have prescribed either hospital or home apnea monitoring following Tiffa-

---

**4.** In fact, the federal Advisory Committee on Civil Rules recently proposed amending rule 705 to clarify its intent. The proposed rule would read, "The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise." Advisory Committee on Civil Rules, Judicial Conference of the United States, *Proposed Amendments to the Federal Rules of Civil Procedure and Federal Rules of Evidence* (1991).

ny's July 16th examination by Dr. Okubo and August 16th visit to the emergency room.

Having identified the specific instances of negligence Dr. Jacobs alleged, we next must determine whether Dr. Jacobs also created an issue of causation as to the Hospital, the doctors, or both. The court of appeals held and defendants argue that Dr. Jacobs' affidavit fails to establish the requisite causal link between defendants' treatment and Tiffany's death. As the court of appeals put it, "[T]here is nothing in the Jacobs affidavit to indicate that the defendants' medical treatment proximately caused Tiffany's death, or even caused her death at all." 790 P.2d at 98.

■ We begin with the question of whether the affidavit links the Hospital's conduct with Tiffany's death. Dr. Jacobs charges the Hospital with negligence in failing to produce the record of Tiffany's first visit to the emergency room when she returned to the Hospital one month later. He asserts that this negligence contributed to Dr. Nickol's allegedly faulty diagnosis, saying that if the Hospital had produced the record, the prior record "would have reinforced the fact that unexplained respiratory problems existed and a differential diagnosis including SIDS should have been developed."

Dr. Nickol testified in deposition that he would have followed the same course of treatment even if the Hospital had supplied him with the record of Tiffany's earlier visit. However, the jury need not believe Dr. Nickol's statement. Because Dr. Jacobs' affidavit alleges a specific causal link between the Hospital's alleged negligence in failing to produce the record and the doctors' alleged failure to diagnose and treat Tiffany's illness, we find that Dr. Jacobs established an issue of fact as to whether the Hospital's alleged negligence caused Tiffany's death. We therefore reverse the grant of summary judgment for the Hospital and remand for disposition in the trial court.

Having determined that Dr. Jacobs' affidavit sufficiently established an issue of causation as to the Hospital, we next consider whether the affidavit establishes a factual question of whether Dr. Nickol's and Dr. Okubo's alleged negligent record keeping and treatment caused Tiffany's death. We begin with the question of negligent record keeping, i.e., the doctors' alleged failure to record the Butterfields' reports that Tiffany turned blue when she stopped breathing. Dr. Jacobs states that the inadequate history of Tiffany's medical condition contributed to her death because the doctors relying on the history were not aware of the scope and severity of her breathing difficulties. As he put it, "[A]n inadequate history lead [sic] to an incomplete assessment and ... failure to consider the need to rule out SIDS as an etiological possibility." Because Dr. Jacobs specifically links the doctors' alleged negligence with a lethal misdiagnosis, we find that his affidavit established an issue of fact as to whether inadequate record keeping caused Tiffany's death.

■ The second issue as to causation with respect to the doctors is whether Dr. Jacobs sufficiently alleged that Dr. Nickol's and Dr. Okubo's failure to prescribe hospital or home monitoring for apnea caused Tiffany's death. Defendants argue that Dr. Jacobs' affidavit was impermissibly conclusory[5] and failed to take into account the four months of Dr. McClellan's intervening care between defendants' treatment of Tiffany and her death. We first address the argument that the affidavit was impermissibly conclusory. The concluding paragraphs of Dr. Jacobs' affidavit sketch his theory of causation regarding Dr. Nickol and Dr. Okubo:

11. On 12/19/84 Tiffany Butterfield did indeed die from SIDS. This would easily have been avoided to a reasonable degree of medical certainty by either in-hospital observation and monitoring for apnea

5. Although at this time we do not decide the effects of failure to object to the submission of expert evidence, we note that both the court and defendants could have required the Butterfields

to supply further factual support of Dr. Jacobs' affidavit. Utah R.Civ.P. 26(b)(4)(A); *see, e.g., Forehead v. Galvin,* 220 Neb. 578, 579, 371 N.W.2d 271, 272 (1985).

followed by the issuance of a home apnea monitor, or simply arranging for a home apnea monitor.

12. While one could perhaps argue that such care was not warrented [sic] following the 07/04/84 emergency visit, I am of the opinion that such care was justified after the 07/16/84 pediatric check-up and/or the 08/16/84 and 10/01/84 emergency room visits. Drs. Okubo and Nichols [sic] and [sic] a duty to insure necessary follow-up was carried out and failed to do so."

13. The above, in my opinion, constitutes care below an accepted standard (negligence) and was the proximate cause of the child's demise from SIDS.

We agree with defendants that Dr. Jacobs could have clarified the chain of causation he alleges between the specific failure to prescribe apnea monitoring and Tiffany's death. However, it is an easy and legitimate inference from the affidavit to the following, more detailed theory of causation: When faced with symptoms like Tiffany's, a reasonable emergency room physician and a reasonable primary pediatrician would have provided some form of monitoring for apnea, whether in the hospital or in the home. Hospital observation or a home apnea monitor would have prevented Tiffany's death to a reasonable degree of medical certainty because hospital observation would have diagnosed Tiffany's breathing problems and home monitoring would have alerted the Butterfields if Tiffany stopped breathing, increasing the efficacy of resuscitative measures.

Because the affidavit outlines the specific facts from which we can infer the details of Dr. Jacobs' theory of causation, we find that Dr. Jacobs' testimony creates a factual issue as to whether Dr. Okubo's and Dr. Nickol's failure to prescribe apnea monitoring caused Tiffany's death.

 Finally, Dr. Nickol and Dr. Okubo argue that because Dr. Jacobs fails to take into account the four months of Dr. McClellan's intervening care, his affidavit cannot establish a factual issue that their care proximately caused Tiffany's death. In short, they argue that even if Dr. Jacobs creates an issue of fact about *causation*, his affidavit is insufficient because it does not create an issue of fact about *proximate* causation. Proximate causation is "[t]hat cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the result would not have occurred." *Mitchell v. Pearson Enters.*, 697 P.2d 240, 245 (Utah 1985) (quoting *State v. Lawson*, 688 P.2d 479, 482 n. 3 (Utah 1984)).

We disagree. Proximate cause is a factual issue that generally cannot be resolved as a matter of law. *Apache Tank Lines, Inc. v. Cheney*, 706 P.2d 614, 615 (Utah 1985); *Mitchell*, 697 P.2d at 245; *Godesky v. Provo City Corp.*, 690 P.2d 541, 544 (Utah 1984); *Unigard Ins. Co. v. City of LaVerkin*, 689 P.2d 1344, 1347 (Utah 1984); *Thompson v. LeGrand Johnson Constr. Co.*, 688 P.2d 489, 491 (Utah 1984); *Watters v. Querry*, 626 P.2d 455, 457–58 (Utah 1981); *Rees v. Albertson's, Inc.*, 587 P.2d 130, 133 (Utah 1978). Because proximate cause is an issue of fact, we refuse to take it from the jury if there is any evidence upon which a reasonable jury could infer causation. *See Jensen v. Mountain States Tel. & Tel. Co.*, 611 P.2d 363, 365 & n. 4 (Utah 1980).

 We recognize that the intervening care poses a close question, particularly in light of the length of Dr. McClellan's treatment and the Butterfields' failure to inform Dr. McClellan of Tiffany's previous breathing problems, which may lead a jury to conclude that there was an intervening cause breaking the chain of causation. However, we also recognize that the Butterfields argue that defendants' lack of concern over Tiffany's breathing problems convinced them that their baby was in no danger and that they consequently saw no reason to raise the issue with Dr. McClellan. Although their theory of causation may be somewhat strained and is premised on a number of factual disputes with defendants as to what occurred between them, it is the province of the jury to resolve these factual disputes and to determine whether the causation theory is fatally attenuated.

In reaching this conclusion, we are mindful of the fact that doubts about whether a nonmovant has established a genuine issue of material fact should be resolved in favor of permitting the party to go to trial. *Rees*, 587 P.2d at 133. Here, the Butterfields adduced expert evidence creating genuine issues of material fact as to whether the doctors' conduct was negligent and whether it caused Tiffany's death. Consequently, the trial court erred in granting summary judgment for Dr. Okubo and Dr. Nickol.

We therefore reverse the court of appeals insofar as it held that Dr. Jacobs' affidavit failed to create an issue of fact as to causation, reverse the summary judgment in favor of defendants, and remand to the district court for a trial on the merits consistent with this opinion.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.