*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2020 UT 6**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LUCIANA RUIZ,
*Appellant,*

*v.*

CLAUDIA KILLEBREW[*],
*Appellee.*

No. 20180882
Heard November 15, 2019
Filed February 13, 2020

On Direct Appeal

Fourth District, Provo
The Honorable Lynn W. Davis
No. 160400532

Attorneys:

Charles H. Thronson, Salt Lake City, for appellant

Nan T. Bassett, Shawn McGarry, Jeremy Speckhals, Salt Lake City,
for appellees Claudia Killebrew and Mount Timpanogos
Women's Health Center

JoAnn E. Bott, John T. Nelson, Douglas J. Crapo, Salt Lake City,
for appellee IHC Health Services, Inc.

JUSTICE HIMONAS authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE PEARCE, and JUSTICE PETERSEN joined.

JUSTICE HIMONAS, opinion of the Court:

---

[*] Other appellees in this case are: MOUNT TIMPANOGOS
WOMEN'S HEALTH CENTER and IHC HEALTH SERVICES, INC. Kari
Lawrence was a party below but is not a party to this appeal.

## INTRODUCTION

¶1     This case boils down to a simple question: Has the plaintiff produced expert evidence that creates a genuine dispute of material fact as to the causation element of her medical malpractice claim? The plaintiff, Luciana Ruiz, argues that there is a dispute as to whether the defendants' failure to deliver her baby before 10:30 p.m. caused her baby's injuries. The defendants, IHC Health Services, Inc. (Hospital) and midwife Claudia Killebrew, contend that Ruiz has not produced evidence that their alleged lack of due care delayed the baby's birth past 10:30 p.m. We agree with the defendants. Because Ruiz has failed to provide evidence that the defendants' specific alleged breaches in the standard of care caused Ruiz's minor child's injuries, we affirm the district court's grant of summary judgment for the defendants.

## BACKGROUND

¶2     On the morning of August 13, 2003, Ruiz—pregnant with G.R.—was admitted to American Fork Hospital[1] for a planned labor induction. Throughout the day, she received care from the Hospital's labor-and-delivery nurses and from a midwife, Claudia Killebrew.

¶3     That night, at around 10:00 p.m., the fetal monitor strip showed that G.R. was in distress. At the same time, the nurses set up for delivery. Shortly afterwards, at 10:04 p.m., Ruiz started to push. Then at 10:28 p.m., the medical team placed a fetal scalp electrode on the baby. Two minutes later, Dr. Kari Lawrence (an obstetrician-gynecologist) was paged. She arrived at 10:50 p.m. and delivered the baby, G.R., vaginally at 11:04 p.m. According to Ruiz's experts, because G.R. was not delivered until after 10:30 p.m., he was injured. Specifically, he had suffered from hypoxia—a lack of oxygen—and as a result, sustained brain damage.

¶4     Almost thirteen years later, Ruiz, as parent and natural guardian of her minor child, G.R., sued the Hospital and Killebrew.[2] She alleged that the Hospital's labor-and-delivery nurses and Killebrew inadequately monitored Ruiz's labor. She

---

[1] IHC Health Services, Inc. was doing business as American Fork Hospital.

[2] Killebrew's employer at the time was Mount Timpanogos Women's Health Center, who is a party to this litigation as well.

also said that G.R. "suffered fetal distress during labor and that failure to deliver him sooner caused him an hypoxic brain injury leaving him handicapped."

¶5     There are two summary judgment orders at issue on appeal. First, the district court granted partial summary judgment for the defendants, dismissing G.R.'s claims for premajority medical expenses—i.e., expenses he would incur before turning eighteen. Later, the district court dismissed G.R.'s remaining negligence claims (claims for medical expenses incurred after he is no longer a minor) because Ruiz had "failed to provide evidence that would establish the necessary causal link between the alleged breaches in standard of care and the supposed injury" to G.R.

¶6     Ruiz appealed both summary judgment orders. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶7     Summary judgment is proper if "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." UTAH R. CIV. P. 56(a). And when reviewing a grant of summary judgment, we examine a district court's conclusions of law for correctness, giving them no deference. *Bowman v. Kalm*, 2008 UT 9, ¶ 6, 179 P.3d 754. "[W]e view the facts in the light most favorable to the non-moving party." *Id.*

## ANALYSIS

¶8     The dispositive issue on appeal is whether the expert testimony created a genuine dispute of material fact as to the causation element of Ruiz's negligence claim.[3] To decide the issue,

---

[3] Ruiz also appeals the partial summary judgment order, arguing that the district court erred in dismissing G.R.'s claim for premajority expenses. In granting partial summary judgment for the defendants, the district court held that Utah follows the common law rule that "only a parent may recover for a minor child's pre-majority medical expenses." It reasoned that the "common law and Utah precedent reflect the majority rule that pre-majority expenses generally belong to the parent." Because the district court properly dismissed Ruiz's medical malpractice claim for want of causation testimony, we need not decide whether it erred by dismissing G.R.'s claim for unpaid premajority medical expenses. We write only to say that we are

(continued . . .)

we first outline the elements of a medical malpractice claim, zeroing in on proximate cause. Then we lay out Ruiz's evidence as to the defendants' breaches in the standard of care and about causation. Finally, we discuss whether Ruiz has shown a genuine dispute of material fact as to whether the defendants' alleged breaches caused G.R.'s injuries. She has not. Even though her experts provided testimony that G.R. was injured because he was not delivered before 10:30 p.m., there is no expert testimony that the defendants' lack of due care made it so G.R. was not delivered before 10:30 p.m. Summary judgment for the defendants was thus proper.

## I. PROXIMATE CAUSE IN MEDICAL MALPRACTICE CASES

¶9     A claim for medical malpractice requires a plaintiff to prove four elements: "(1) the standard of care by which the [medical professional's] conduct is to be measured, (2) breach of that standard by the [medical professional], (3) injury that was proximately caused by the [medical professional]'s negligence, and (4) damages." *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 96, 82 P.3d 1076 (citation omitted). At issue here is the third element of medical malpractice—whether G.R.'s injury was proximately caused by the defendants' negligence.

¶10     The proximate-cause element requires the plaintiff to show that the alleged breach, "in natural and continuous sequence, unbroken by an efficient intervening cause, produce[d] the injury" and that without the alleged breach "the result would not have occurred." *Butterfield v. Okubo*, 831 P.2d 97, 106 (Utah 1992) (citation omitted). The plaintiff can meet this burden by providing "evidence upon which a reasonable jury could infer causation." *Id.* But the jury cannot be left to "speculate and guess on too many elements in the chain of causation." *Jackson v. Colston*, 209 P.2d 566, 569 (Utah 1949).

---

somewhat skeptical that a minor does not have a separate interest in medical expenses that have not yet been paid for. To be sure, parents alone have a claim against a tortfeasor for past medical expenses they have paid for. *See Ostertag v. La Mont*, 339 P.2d 1022, 1026 (Utah 1959) (holding that a minor did not have a claim for medical expenses paid for by his father). But that does not automatically mean that minors do not have a distinct claim for *unpaid* premajority medical expenses.

¶11   To ensure that the jury is not left to speculate, plaintiffs may not provide just any evidence of proximate cause: They must generally "produce *expert* testimony that the medical professional's negligence proximately caused the plaintiff injury." *Butterfield*, 831 P.2d at 102 (emphasis added); *see also Bowman v. Kalm*, 2008 UT 9, ¶ 7, 179 P.3d 754.[4] The expert-testimony requirement exists because "most medical malpractice cases depend upon knowledge of the scientific effect of medicine." *Bowman*, 2008 UT 9, ¶ 7 (citation omitted). And so "the standard of care and the causal link between the negligence and the injury are usually not within the common knowledge of the lay juror." *Id.* Expert testimony thus "ensure[s] that factfinders have adequate knowledge upon which to base their decisions." *Id.*

## II. EXPERT TESTIMONY ABOUT BREACHES IN THE STANDARD OF CARE AND CAUSATION

¶12   Having reviewed the proximate-cause element of a medical malpractice claim, we analyze whether the district court properly dismissed Ruiz's claim for the lack of this element. To do so, we must first identify the alleged breaches of the standard of care. *Butterfield v. Okubo*, 831 P.2d 97, 104 (Utah 1992) ("Because we cannot determine whether [the expert] sufficiently averred a causal link between defendants' purported negligence and [the baby's] death without knowing what negligence [the expert] identified, we will examine [the expert's] affidavit for specific allegations of negligence before we turn to the question of causation."). After that, we examine the testimony as to causation.

*A. Expert Testimony About Alleged Breaches in the Standard of Care*

¶13   To stave off summary judgment, Ruiz must produce expert testimony that the defendants' negligence proximately caused G.R.'s injury. Thus we focus on the expert testimony about

---

[4] Not every medical malpractice case requires expert testimony. We have recognized a "limited 'common knowledge' exception to the general requirement, which may excuse a lack of expert testimony in some circumstances." *Bowman v. Kalm*, 2008 UT 9, ¶ 9, 179 P.3d 754. The common-knowledge exception "applies when the causal link between the negligence and the injury would be clear to a lay juror who has no medical training—i.e., when the causal connection is readily apparent using only 'common knowledge.'" *Id.* This exception has not been raised by the parties here.

how the nurses and Killebrew breached the standard of care. Ruiz designated two standard-of-care experts—Tracy Keith to opine on the labor-and-delivery nurses' breaches of the standard of care and Janis Cox to testify as to the midwife's breaches of the standard of care.

1. The Nurses' Alleged Breaches in the Standard of Care

¶14    Keith, the sole standard-of-care expert as to the labor-and-delivery nurses, testified that the nurses breached the standard of care in seven ways:

(1) "Failed to assess, recognize, and/or document fetal heart rate and decelerations[5] in a timely manner;"

(2) "Should have waited before increasing oxytocin[6] ([also known as] Pitocin or 'Pit');"

(3) "Should have recognized tachysystole[7] and lowered the oxytocin;"

(4) "Should have repositioned the patient and/or performed other interventions;"

(5) "Failed to timely place a fetal scalp electrode;"[8]

(6) "Allowed Ms. Ruiz to push without a documented fetal heart rate assessment;" and

(7) "Failed to document that Killebrew was present and aware of difficulty in obtaining a continuous heart rate tracing."[9]

---

[5] Dr. Luciani testified that late decelerations are "indicative of fetal hypoxia" and that variable decelerations "come from cord compression."

[6] From the expert testimony, it appears that oxytocin is a drug used to induce labor.

[7] According to Keith, "[t]achysystole is more than five contractions in a ten-minute period."

[8] The expert testimony explains that a fetal scalp electrode is a device that allows a medical professional to "monitor the fetal heart rate."

[9] The Hospital identified these seven breaches in its motion for summary judgment, citing to lines of Keith's deposition. Ruiz

(continued . . .)

For more context, we now emphasize the timing of the seven breaches, along with any pertinent details.

¶15   As for the first breach, the nurses breached the standard of care by not assessing or documenting the fetal heart rate several times between 12:00 p.m. and 10:26 p.m. They also breached the standard of care by not recognizing or documenting decelerations many times between 12:15 p.m. and 9:35 p.m.

¶16   The nurses' second breach came at 12:32 p.m. when they increased the oxytocin. The third breach happened at 6:15 p.m.; the nurses failed to recognize or document tachysystole and did not lower the oxytocin. The fourth breach is related to the first breach. The nurses lacked due care by not *intervening*—e.g., by changing the patient's position—in response to the decelerations that occurred at 7:18 p.m., 7:21 p.m., 9:12 p.m., 9:14 p.m., 9:16 p.m., and 9:18 p.m. As for the fifth breach, the nurses lacked due care by not placing a fetal scalp electrode at 10:04 p.m. The sixth breach happened when the nurses allowed Ruiz "to push without a fetal heart rate assessment" from 10:01 p.m. to 10:31 p.m. And the seventh breach occurred from 10:04 p.m. to 10:11 p.m., when the nurses did not document that they notified Killebrew of their "inability to locate the fetal heart rate."[10]

_____

responded by admitting that Keith had testified to these breaches and by adding, "Expert witness Nurse Keith also provided substantial additional criticisms beyond these of the labor and delivery nurses at defendant Hospital." But Ruiz did not specify what those criticisms were, nor did she cite to the record for that argument. We review only what was properly presented to the district court. *Stichting Mayflower Mountain Fonds v. United Park City Mines Co.*, 2017 UT 42, ¶ 43, 424 P.3d 72 ("The district court had no duty to look beyond [the plaintiff's] bald statements to identify supporting evidence buried somewhere in the record."). Thus we limit our review to these seven breaches and the specific deposition testimony cited to for support.

[10] The Hospital points out that Ruiz said in her brief that "the Hospital's nurses breached the standard of care by 'fail[ing] to contact on-call Ob-Gyn Dr. Lawrence.'" This argument, the Hospital contends, is not preserved because it was "never made to the district court or at any time and her brief cites no record evidence." Ruiz did not respond to this argument in her reply

(continued . . .)

2. Killebrew's Alleged Breaches in the Standard of Care

¶17　We now pivot to the expert testimony about the ways in which Killebrew breached the standard of care. Cox, the only standard-of-care expert as to midwifes, testified that Killebrew breached the standard of care in four ways:

(1) "Failure to apply a fetal scalp electrode;"

(2) "Failure to utilize an intrauterine pressure catheter with Pitocin in a vaginal birth after Cesarean;"[11]

(3) "Failure to notify [obstetrician-gynecologist] Dr. Lawrence and get her involved earlier;" and

(4) "Failure to stop Pitocin."

Again, we draw attention to the timing and relevant details of these four alleged breaches.

¶18　The first breach arose at 7:12 p.m. At that point, Killebrew should have placed and left on a fetal scalp electrode "so that the baby could have been monitored internally." According to Cox, with a fetal scalp electrode, a midwife "should be able to get a continuous fetal heart tone."

¶19　The record is muddy as to what time the second breach occurred. But Cox did explain that placing an intrauterine pressure catheter allows a midwife to know about any decelerations in the baby's heartrate.

¶20　The third breach happened at 7:12 p.m. According to Cox, at that time, "Dr. Lawrence should have been notified and just kept . . . updated on the . . . progress of this patient . . . ."

¶21　Killebrew's fourth breach, according to Cox, happened at 10:00 p.m. Cox explained that a midwife should not "run Pitocin without an adequate fetal heart strip" if the midwife is "going to have [the mother] start pushing."

---

brief. We agree with the Hospital, and so do not consider this alleged breach.

[11] According to Cox, an intrauterine pressure catheter allows a medical professional to "see the actual pressure that's being exerted on the uterus." It is used when a woman is going to have a vaginal birth, aided by Pitocin, but had a cesarean section for a prior delivery.

### B. Expert Testimony About Proximate Cause

¶22 Having reviewed the testimony as to the nurses' and midwife's lack of due care, we turn to the causation experts' testimony. Ruiz argues that two causation experts—Dr. Michael Katz and Dr. Richard Luciani—have established that "it was the failure on the part of those attending this labor (the nurses and nurse midwife) to recognize evidence of fetal distress in G.R. and to expedite in any fashion delivery of G.R. prior to 10:30 p.m. and that proximately caused G.R.'s brain damage."[12]

¶23 Dr. Katz agreed that "it was the delay in delivering [G.R.] . . . that led proximately to his injury." Dr. Katz did not testify that the midwife's or the nurses' lack of due care caused the hypoxia; he testified only that the child would "not have been neurologically impaired" had he been delivered an hour earlier. More specifically, he agreed that "if the child had been delivered during some time prior to that last hour, the probability is that the child would have been neurologically intact."

¶24 Dr. Luciani[13] explained the fetal monitor strips from 10:03 p.m. to 11:07 p.m. He said that "the baby was absolutely fine prior to 10 p.m. in terms of its fetal monitoring." But starting at 10:03 p.m., the fetal monitor strips showed "late decelerations." And those late decelerations were "absolutely indicative of fetal hypoxia."[14] Then, beginning at 10:11 p.m., the fetal monitor strip

---

[12] Neither Dr. Katz nor Dr. Luciani testified as to breaches in the standard of care. That is because during discovery, the parties stipulated that each party would have only one standard-of-care expert per specialty—i.e., Keith would be the one standard-of-care expert for the labor-and-delivery nurses and Cox would be the sole standard-of-care expert as to Killebrew. Besides that, in Katz's and Luciani's depositions, they were careful to clarify that they were not speaking as to breaches in the standard of care.

[13] Before his deposition, Dr. Luciani did not read the depositions of the standard-of-care experts. After his deposition, Dr. Luciani submitted a correction sheet for his deposition. In it, he said that he had "subsequently reviewed the depositions of Janis Cox CNM and Tracy Keith RN which did not change my opinions in this case." The correction sheet, however, has no effect on our analysis, since it did not add testimony creating a link between the defendants' alleged breaches and G.R.'s injuries.

[14] Hypoxia is the "decreased oxygenation of the fetus."

showed "variable decelerations."[15] A few minutes later, at 10:19 p.m., the fetal monitor strip was still "nonreassuring," showing signs of hypoxia.

¶25 Dr. Luciani ultimately concluded that "major damage occurred after [10:30 p.m.] because of the persistent hypoxia and acidosis that was developing." That conclusion is reiterated in a note that Dr. Luciani attached to his deposition, which read: "Earlier delivery before 10:30 p.m. equals normal or markedly less injured infant. Nonreassuring strips after 10 p.m. . . . The failure to recognize the problem and expedite delivery, led to infant born damaged." In his deposition, he was asked whether he was saying in this note that the "baby should have been delivered before 10:30 p.m." "That's not what I said," he responded, "The way I wrote it down is that, in my opinion, if the baby was born before 10:30 p.m., based on what I've seen in the fetal monitor strips, that baby would have been either normal or markedly less injured. . . . I believe that major damage occurred after [10:30 p.m.] because of the persistent hypoxia and acidosis that was developing."

### III. RUIZ HAS NOT SHOWN A GENUINE DISPUTE OF MATERIAL FACT AS TO WHETHER G.R.'S INJURY WAS PROXIMATELY CAUSED BY THE DEFENDANTS' LACK OF DUE CARE

¶26 Having discussed the expert testimony on lack of due care and causation, we now turn to whether Ruiz has produced expert testimony of a causal link between the defendants' specific breaches in the standard of care and G.R.'s injury. We agree with the district court: Neither Dr. Luciani nor Dr. Katz offered evidence that G.R.'s injury was caused by the defendants' alleged breaches.[16]

¶27 Our opinion in *Anderson v. Nixon* serves as an example of a medical malpractice case in which there was insufficient

---

[15] "[V]ariable decelerations . . . come from cord compression," which "can lead to fetal hypoxia."

[16] As the Hospital points out, Ruiz's opening brief on appeal "cites to no testimony from Tracy Keith, R.N." Nor does she cite to testimony from Cox. This is odd, given that Ruiz must show a causal link between breaches in the standard of care and G.R.'s injury. "We will not make or develop [Ruiz's] arguments for [her]." *State v. Gomez*, 2002 UT 120, ¶ 20, 63 P.3d 72.

causation evidence. 139 P.2d 216 (Utah 1943), *overruled on other grounds by Swan v. Lamb*, 584 P.2d 814 (Utah 1978). There, a patient alleged that he was injured because the defendant physician had been negligent, among other things, (1) by failing to diagnose his condition correctly by a specific date and (2) by not giving blood transfusions. *Id.* at 218. We held that there was insufficient evidence that these alleged negligent acts were the proximate cause of the patient's injury. *Id.* at 220. We noted that "[t]here was no expert evidence" that the patient's injury "could have been avoided" if the physician had correctly diagnosed the patient on time. *Id.* Also, "[n]o expert testified that had [the doctor] recognized the symptoms" earlier, "he could have alleviated or cured it." *Id.* Even though one expert testified that blood transfusions were "beneficial in blood stream infections"—such as the infection the patient had—no expert testified that "had there been transfusions the end result might have been avoided." *Id.* In short, "there was no evidence that anything [the physician] did or failed to do . . . caused the end result." *Id.*

¶28 As in *Anderson*, Ruiz's experts have solved only part of the medical malpractice equation. Cox and Keith testified that the defendants breached the standard of care in many ways. And Dr. Luciani and Dr. Katz "testified that [G.R.] suffered from a hypoxic event or lack of oxygen to his brain at or during the last half hour of his birth." But, like in *Anderson*, Ruiz's experts did not knit together the defendants' alleged breaches with the failure to deliver G.R. by 10:30 p.m. They did not testify that if the defendants had not breached the standard of care, G.R. would likely have been born by 10:30 p.m., and thus "the end result might have been avoided." *Id.* at 220. It was not enough for Ruiz's causation experts to testify that G.R. would have been uninjured or less injured had he been delivered by 10:30 p.m. The expert testimony needed to show a genuine issue of material fact as to whether the defendants' breaches in the standard of care caused G.R. to be delivered after 10:30 p.m., which in turn caused his injuries. It did not do so.

¶29 *Otero v. Salvidar*—a Texas case—rightly illustrates what is missing from Ruiz's causation evidence. No. 13-17-00621-CV, 2018 WL 2372514 (Tex. App. May 24, 2018). There, a baby suffered hypoxic ischemic encephalopathy—"a severe, permanent brain injury caused by a lack of oxygen and blood flow"—during her delivery. *Id.* at *1. A physician had been called to evaluate the mother at 8:19 a.m. and performed a cesarean section at 9:22 a.m. *Id.* Having been sued for negligence, the physician argued on

appeal that the trial court should have dismissed the claim because the expert testimony did not adequately address proximate causation. *Id.* at *1, 3.

¶30 Consistent with our case law, the *Otero* expert first identified the breach. *Id.* at *4. ("[The physician] should have ordered a C-Section at 08:20 am. . . .") Then it linked that breach with the baby's injury. *Id.* ("[I]f [the physician] ordered a STAT C-Section at 08:20 then the baby would have been born by 08:50. However, since [the physician] breached the standard of care by failing to recognize the fetal distress and delayed delivering the baby until 09:22 am, the baby suffered at least an extra 32 minutes of fetal distress from lack of adequate oxygen. I believe within reasonable medical probability that each minute of further delay before 09:22 until [the baby] was delivered increased the extent of her permanent injuries."). This expert testimony, held the Texas Court of Appeals, adequately addressed proximate cause since, "according to [the expert's] opinion, the extent of [the baby's] brain injury would not have occurred but for [the physician's] failure to act." *Id.*

¶31 The *Otero* expert causation testimony underscores how lacking Ruiz's expert causation testimony is. Unlike the *Otero* expert, Ruiz's experts did not testify that the defendants' breaches in the standard of care "delayed delivering the baby" until 10:30 p.m. Indeed, there is no expert testimony here from which a jury could reasonably infer that G.R. would have been born before 10:30 p.m. (1) if the nurses had not failed to assess, recognize, or document the fetal heart rate and decelerations in a timely manner; (2) if the nurses had not failed to wait before increasing oxytocin; (3) if the nurses had recognized tachysystole and lowered the oxytocin; (4) if the nurses had repositioned the patient or performed other interventions; (5) if the nurses had placed a fetal scalp electrode at 10:04 p.m.; (6) if the nurses had not allowed Ruiz to push without a documented fetal heart assessment; or (7) if the nurses had not failed to document that Killebrew was present and aware of the difficulty in obtaining a continuous heart tracing. In other words, there "was no expert evidence," that G.R.'s injury "could have been avoided" if the nurses had not breached the standard of care. *Anderson*, 139 P.2d at 220.

¶32 Suppose, for example, that the nurses had placed a fetal scalp electrode at 10:04 p.m. What would have happened as a result? Even if we were to assume that the fetal scalp electrode

would have alerted the nurses to the fetal distress, would that have prompted the nurses to respond in some way? (After all, at that point, Ruiz was already pushing.) What should that response have been? How long would that response have taken? And if that intervention had taken place, would the delivery likely have taken place before 10:30 p.m.? The answers to these questions "depend upon knowledge of the scientific effect of medicine," *Bowman v. Kalm*, 2008 UT 9, ¶ 7, 179 P.3d 754 (citation omitted), and thus require expert testimony.

¶33    Likewise, there is no expert testimony from which a jury could reasonably infer that G.R. would have been born before 10:30 p.m.—and would thus have likely been uninjured or less injured—had Killebrew (1) applied a fetal scalp electrode at 7:12 p.m.; (2) used an intrauterine pressure catheter; (3) notified Dr. Lawrence and gotten her involved earlier; or (4) stopped Pitocin. Much like in *Anderson*, there was no testimony that, if Killebrew had not breached the standard of care in these ways, "the end result might have been avoided." 139 P.2d at 220.

¶34  Imagine, for instance, if Killebrew had gotten Dr. Lawrence involved at 7:12 p.m. instead of breaching the duty of care by failing to do so. Would the results likely have been different? What would Dr. Lawrence have done? Would she have, for example, ordered a cesarean section? Was Ruiz even an eligible candidate for a cesarean section? If so, what time would that cesarean section have been ordered? How long would that cesarean section have taken to set up and perform? And, absent a cesarean section, what else could she have done to expedite delivery? In short, would someone have likely been able to deliver G.R. before 10:30 p.m.? Again, the answers to these questions are "not within the common knowledge of the lay juror," *Bowman*, 2008 UT 9, ¶ 7, and so cannot be left to the jury. This is especially true considering Dr. Luciani's testimony that "the baby was absolutely fine prior to 10 p.m. in terms of its fetal monitoring."

¶35    Ruiz would have us hold that, even though there is no *direct* expert testimony connecting the defendants' breaches with G.R.'s injury, "Dr. Luciani's testimony allows for an 'easy and legitimate inference'[17] that a medical professional monitoring

_____

[17] We used the phrase "easy and legitimate inference" in *Butterfield v. Okubo*, 831 P.2d 97, 106 (Utah 1992). By so doing, we did not announce a new standard for proximate cause. That

(continued . . .)

fetal heart strips would detect late decelerations and prevent injury." She sees Dr. Luciani's testimony as establishing "that it was the failure to recognize . . . fetal hypoxia and to intervene to deliver G.R. prior to 10:30 p.m. that lead to his brain injury." But Ruiz asks us to stretch the inference beyond reasonableness. Without relying upon additional "knowledge of the scientific effect of medicine," a reasonable jury could not infer from Dr. Luciani's testimony that the defendants could or would have done something to intervene or prevent injury. Put differently, the jury could not infer that G.R. would likely have been delivered by 10:30 p.m. had the defendants monitored the labor properly. For the reasons outlined above, it would simply be too big of a leap.[18]

¶36   At core, Ruiz has presented "no evidence from which a lay person could infer that the course of . . . treatment and [G.R.'s] ultimate injuries would have been any different had" the nurses or Killebrew not lacked due care. *Easterling v. Kendall*, 367 P.3d 1214, 1229 (Idaho 2016). The defendants' alleged breaches of the standard of care and G.R.'s injury are two islands, unbridged by expert causation testimony. And we cannot allow the jury to swim from the former to the latter. *See Morgan v. Intermountain Health Care, Inc.*, 2011 UT App 253, ¶ 16, 263 P.3d 405 ("Without expert testimony, a jury of laypersons could not be expected to sift through this medical evidence and make a reliable finding of

---

phrase is synonymous with "reasonable inference." *See id.* (noting that, to jump the proximate-cause hurdle, a plaintiff must provide "evidence upon which a reasonable jury could infer causation").

[18] At oral argument, Ruiz argued that this court should adopt Chief Justice Wolfe's concurrence in *Anderson v. Nixon*, 139 P.2d 216, 221 (Utah 1943), *overruled on other grounds by Swan v. Lamb*, 584 P.2d 814 (Utah 1978). Chief Justice Wolfe suggested that the court apply a burden-shifting framework to medical malpractice claims that involve negligent omissions. *Id.* at 222 (Wolfe, C.J., concurring) (proposing a framework in which, once a plaintiff offers proof of omissions that are not "trivial or incidental," the *defendant* must "show that in the particular case under consideration the measures advocated would not have changed the result"). Ruiz, however, did not make this argument either in her briefs on appeal or below on summary judgment. It is thus not preserved, and we do not address it.

proximate cause."). And so the district court did not err in granting the defendants' motion for summary judgment.[19]

## CONCLUSION

¶37 Because Ruiz has not shown a genuine dispute of material fact as to the causation element of her medical malpractice claim, we affirm the district court's grant of summary judgment for the defendants.

---

[19] Ruiz argues that we should remand to the district court with instructions to reopen discovery if we do not find a genuine issue of material fact as to the defendant's negligence. But, as the Hospital argues, that issue is not preserved because Ruiz never sought a second chance for expert discovery from the district court. Thus we do not address the issue.