2011 UT App 253

**Midge MORGAN, Plaintiff and Appellant,**

v.

**INTERMOUNTAIN HEALTH CARE, INC.; IHC LDS Hospital; and John Does and Jane Does I through X, Defendants and Appellees.**

No. 20091044–CA.

Court of Appeals of Utah.

July 29, 2011.

Tim Dalton Dunn, Salt Lake City, for Appellant.

Joann E. Bott and David C. Castleberry, Salt Lake City, for Appellee.

Before Judges DAVIS, McHUGH, and VOROS.

## OPINION

VOROS, Judge:

¶ 1 Midge Morgan appeals the trial court's entry of summary judgment in favor of Intermountain Health Care, Inc. and others (collectively, IHC). The trial court granted summary judgment on the ground that Morgan could not establish a prima facie case of medical malpractice without a designated medical expert. We affirm.

## BACKGROUND

¶ 2 Many of the facts of this case are in dispute. Because this appeal arises from the trial court's grant of summary judgment in favor of IHC, we recite the facts in the light most favorable to Morgan, except as noted. *See Neff v. Neff*, 2011 UT 6, ¶ 16 & n. 5, 247 P.3d 380. In June 1998, Morgan was involved in an automobile accident and sustained injuries to her head, neck, and back. As a result, on February 27, 2003, she underwent back surgery at an IHC-owned hospital. The surgery involved harvesting bone from her right hip. The following morning, Morgan could not feel or move her right leg. She was unable to get out of bed to use the bathroom and therefore requested a bedpan from the nurse on duty (the Nurse). The Nurse told her that LDS Hospital did not use bedpans. Morgan stated that she had used one throughout the night following her surgery. When Morgan insisted that the Nurse bring her a bedpan, the Nurse replied, "You are getting up." Morgan alleges that the Nurse "then proceeded to put her right arm across—underneath my left arm and

across my chest and grabbed under my right armpit, and then she took her left hand on top ... and proceeded to try to pull me and jerk me forward and up and over the railing [of the bed] to put me on my feet." Morgan felt a "horrible pain" and "let out screams." At this point, the Nurse dropped Morgan and Morgan fell back onto the bed. Morgan's pain level increased thereafter and she was later discovered to have tears in the rotator cuffs in both her shoulders, requiring surgery. She filed suit against IHC, alleging medical malpractice, negligence, and vicarious liability.

¶ 3 This was not Morgan's first medical issue relating to her neck and shoulders. In 1970, she dislocated her shoulder and had a staple inserted and removed. After the car accident in 1998, Morgan began repeatedly seeing Dr. Stephen Warner. In 1999, Dr. Warner noted that Morgan complained of neck pain, headaches, and "bilateral arm pain and numbness." In 2001, Dr. Warner noted that Morgan complained of "right shoulder pain" and numbness in both of her arms; he also noted her previous shoulder surgery. In January 2003, Dr. Warner noted that Morgan suffered from neck pain followed by pain and numbness in her left arm. He also noted that rotating her shoulders "precipitate[d] shoulder and arm pain."

¶ 4 In July 2008, IHC designated a list of expert witnesses, including Dr. Bruce Evans. Based on his review of relevant medical records and deposition testimony, Dr. Evans opined in an affidavit that Morgan's shoulder problems pre-existed her surgery in February 2003. Dr. Evans cited Morgan's dislocated shoulder and subsequent surgery in 1970, her 1998 car accident and subsequent bilateral shoulder pain, and her shoulder pain before the 2003 surgery. Dr. Evans also opined that it was "hard to imagine that both" of Morgan's rotator cuffs could have been torn during the incident following her surgery. He further opined that Morgan's age, medical history, and neck injury accident could have caused degenerative tearing of her rotator cuffs.

¶ 5 Morgan did not designate an expert witness. However, in opposing summary judgment, she relied on the deposition of her treating physician, Dr. Warner. Dr. Warner stated that, before Morgan's surgery, "the pain that she was experiencing seemed to be coming from her neck." However, with rotator cuff tears in particular, he testified, "I'm not aware of any article that describes neck problems as a cause of rotator cuff tears. If you could produce some literature, I would like to see it." He further testified that "it's possible" that the tears in Morgan rotator cuffs were caused by the incident with the Nurse. Dr. Warner did not state that it was more likely than not that Morgan's injuries were caused by the incident with the Nurse.

¶ 6 IHC filed a motion for summary judgment. IHC contended that without a medical expert, Morgan was unable to establish the standard of care, breach of the standard, and proximate cause. In particular, IHC argued that expert testimony was necessary to establish the element of causation in light of Morgan's pre-existing shoulder injuries and shoulder pain. Morgan responded that expert testimony was not necessary to prove her claims. She also argued that genuine issues of material fact precluded summary judgment. The trial court agreed with IHC that expert testimony was required to establish causation: "This Court concludes that lay testimony is not sufficient to explain whether Plaintiff's shoulder injuries were the result of a previous injury and surgery or the act of a nurse."[1] The trial court therefore granted IHC's motion for summary judgment.

## ISSUE AND STANDARD OF REVIEW

¶ 7 On appeal, Morgan contends that the trial court erred in entering summary judgment against her based on her lack of an expert witness.[2] Summary judgment is ap-

---

1. The court did not address whether expert testimony was required to establish the standard of care and the breach of that standard.

2. On appeal, both parties address the elements of standard of care, breach, and proximate cause.

However, the trial court's ruling was limited to proximate cause. We likewise limit our analysis to that element.

propriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We "review[ ] a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and view[ ] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 10, 235 P.3d 730 (citation and internal quotation marks omitted).

## ANALYSIS

¶ 8 Morgan contends that expert testimony was not required to establish her medical malpractice claim because the cause of her injury was within the common knowledge and experience of a lay juror. To establish medical malpractice, a plaintiff must prove four elements: (1) the standard of care required of health care providers under the circumstances; (2) breach of that standard by the defendant; (3) injury proximately caused by the breach; and (4) damages. *See Jensen v. IHC Hospitals, Inc.*, 2003 UT 51, ¶ 96, 82 P.3d 1076; *Schuurman v. Shingleton*, 2001 UT 52, ¶ 10, 26 P.3d 227; *Dalley v. Utah Valley Reg'l Med. Ctr.*, 791 P.2d 193, 195 (Utah 1990). "A plaintiff's failure to present evidence that, if believed by the trier of fact, would establish any one of the [elements] of the prima facie case justifies a grant of summary judgment to the defendant." *Kent v. Pioneer Valley Hosp.*, 930 P.2d 904, 906 (Utah Ct.App.1997) (alteration in original) (citation and internal quotation marks omitted).

¶ 9 "There is a general requirement in medical malpractice cases that the element of proximate cause be supported by expert testimony." *Bowman v. Kalm*, 2008 UT 9, ¶ 7, 179 P.3d 754 (citing *Butterfield v. Okubo*, 831 P.2d 97, 102 (Utah 1992) ("To recover for

medical malpractice, the plaintiff must produce expert testimony that the medical professional's negligence proximately caused the plaintiff injury."); *Dalley*, 791 P.2d at 195 ("To establish the standard of care required of a physician in a particular field, breach of that standard, and proximate cause, the plaintiff is generally required to produce an expert witness...."); *Nixdorf v. Hicken*, 612 P.2d 348, 354 n. 17 (Utah 1980) ("The plaintiff also has the burden of proving the negligence of the defendant was the proximate cause of the injury. This proof requires some expert testimony in medical malpractice cases."); *see also Fox v. Brigham Young Univ.*, 2007 UT App 406, ¶ 22, 176 P.3d 446 ("[W]here the injury involves obscure medical factors which are beyond an ordinary lay person's knowledge, necessitating speculation in making a finding, there must be expert testimony that the negligent act probably caused the injury." (citation and internal quotation marks omitted)). "This requirement is grounded in the fact that most medical malpractice cases depend upon knowledge of the scientific effect of medicine." *Bowman*, 2008 UT 9, ¶ 7, 179 P.3d 754 (citation and internal quotation marks omitted). "Because the standard of care and the causal link between the negligence and the injury are usually not within the common knowledge of the lay juror, testimony from relevant experts is generally required in order to ensure that factfinders have adequate knowledge upon which to base their decisions." *Id.*[3]

¶ 10 This general rule is subject to a limited "common knowledge" exception:

There is a limited "common knowledge" exception to the general requirement, which may excuse a lack of expert testimony in some circumstances. This exception applies when the causal link between the negligence and the injury would be clear to

---

**3.** Morgan styled one of her claims "negligence" rather than "medical malpractice" and argues that this distinction affects whether expert medical testimony is necessary to prove proximate cause. We do not believe it does. The relevant question is whether a lay juror could, without the assistance of expert medical testimony, sort out the evidence of causation, not whether the claim is styled "medical malpractice." *See Fox v. Brig-*

*ham Young Univ.*, 2007 UT App 406, ¶ 23, 176 P.3d 446 (requiring expert medical testimony to prove causation in an ordinary negligence case); *see also Cunningham v. Riverside Health Sys., Inc.*, 33 Kan.App.2d 1, 99 P.3d 133, 136 (2004) ("Whether a case is classified as ordinary negligence or medical malpractice is not determinative of whether expert testimony is required.").

a lay juror who has no medical training— i.e., when the causal connection is readily apparent using only "common knowledge." *Id.*[4] However, "[i]t is only in the most obvious cases that a plaintiff may be excepted from the requirement of using expert testimony to prove causation." *Fox*, 2007 UT App 406, ¶ 22, 176 P.3d 446 (citation and internal quotation marks omitted); *see also Chadwick v. Nielsen*, 763 P.2d 817, 821 (Utah Ct.App.1988) (noting that the exception is applied only in "unusual circumstances"). Although the common knowledge exception has usually been applied to the element of standard of care, *see Bowman*, 2008 UT 9, ¶ 10, 179 P.3d 754, it is not true "that proximate cause must *always* be supported by expert testimony in medical malpractice cases," *id.* ¶ 12. Expert testimony is not required "where the causal connection between the breach of the standard of care and the harm suffered is apparent using common knowledge." *Id.* However, evidence that a pre-existing condition contributed to a plaintiff's injury may render the injury's cause too complex to fit within the common knowledge exception. *See, e.g., Fox*, 2007 UT App 406, ¶ 23, 176 P.3d 446; *Hall v. Steimle*, 2009 UT App 224U, para. 4, 2009 WL 2569266 (mem.).

¶ 11 *Bowman v. Kalm*, 2008 UT 9, ¶ 7, 179 P.3d 754, was a medical malpractice case where expert testimony was not required to establish causation. There, the patient was seeing a psychiatrist for anorexia, depression, and anxiety. *See id.* ¶ 2. The psychiatrist knew or should have known that the patient had proclivities to overdose on sleeping medication and to be clumsy due to the medication and her anorexia. *See id.* ¶ 4. The psychiatrist wrote her a prescription for thirty sleeping pills. *See id.* ¶ 2. The next day the patient was found dead from asphyxiation, "pinned under a bedroom dresser against her bed frame." *Id.* ¶¶ 3, 13. Thirteen of the thirty sleeping pills were missing. *See id.* ¶ 3.

¶ 12 Our supreme court held that the common knowledge exception applied, and reversed the summary judgment entered in favor of the psychiatrist. *See id.* ¶ 14. "The causal connection between a decedent made clumsy due to a doctor's negligence, and that decedent's death due to a dresser being pulled down on top of her," the court concluded, "is not one that requires specialized medical knowledge." *Id.* ¶ 13. Nevertheless, the court added that some type of expert testimony on the issue might be helpful at trial, "including, perhaps, testimony on the mechanics of how the dresser could have been made to tip over." *Id.* ¶ 14. As these quotations indicate, the supreme court's analysis focused solely on the question of whether the patient's drug-induced clumsiness caused the dresser to fall on her. The court did not examine the prior links in the causal chain—whether the psychiatrist's negligence caused the overdose and whether the overdose caused the clumsiness.

¶ 13 Another case, *Malmstrom v. Olsen*, 16 Utah 2d 316, 400 P.2d 209 (1965), involved standard of care rather than causation. It is nevertheless illuminating because its facts resemble those at bar. The plaintiff sued her chiropractor for malpractice "in giving treatments for low back pains in her spine, and thereby rupturing the fifth and sixth cervical discs in her neck." *Id.* at 210. Two medical doctors testified that the ruptures were caused by "violent jerks of her head and neck" by the chiropractor. *See id.* at 211. But the trial court entered a nonsuit judgment for lack of expert testimony that

---

4. Res ipsa loquitur represents "a separate ... exception to the general requirement for expert testimony in medical malpractice cases." *Bowman v. Kalm*, 2008 UT 9, ¶ 9 n. 3, 179 P.3d 754. In the medical malpractice arena, res ipsa loquitur cases typically involve injuries suffered by patients during surgery. *See, e.g., Baczuk v. Salt Lake Reg'l Med. Ctr.*, 2000 UT App 225, ¶ 2, 8 P.3d 1037 (patient emerged from hand surgery with pressure injury or burn on his buttocks); *Dalley v. Utah Valley Reg'l Med. Ctr.*, 791 P.2d 193, 194 (Utah 1990) (patient with a healthy leg underwent caesarean section operation and emerged with a burn on her leg); *Nixdorf v. Hicken*, 612 P.2d 348, 351, 354 & n. 17 (Utah 1980) (holding that expert medical testimony was not necessary to establish negligence where surgeon left a needle in the patient's body, but stating that proof of proximate cause "requires some expert testimony in medical malpractice cases"); *Pete v. Youngblood*, 2006 UT App 303, ¶ 3, 141 P.3d 629 (surgeon left gauze in surgical site). Because Morgan does not rely on the doctrine of res ipsa loquitur, those cases do not control this one. But our holding today is fully consonant with the principles expressed in them.

the chiropractor's actions fell below the relevant standard of care. *See id.* at 210. The supreme court reversed. *See id.* at 212. It held that "the ordinary lay person could conclude that this violent jerk if it ruptured the cervical discs would be a violation of the chiropractic standards." *See id.* That the violent jerk did in fact rupture the cervical discs, however, was established through expert medical testimony. *See id.* at 211–12.

¶ 14 Applying the foregoing principles and precedents to the case before us, we conclude that this is not among the most obvious cases where "the causal connection between the breach of the standard of care and the harm suffered is apparent using common knowledge." *Bowman*, 2008 UT 9, ¶ 12, 179 P.3d 754. The experience of having one's arm pulled or even jerked is indeed common. And if Morgan claimed no more than that she experienced pain when the Nurse pulled on her arms, this case would probably fall within the common knowledge exception. But Morgan alleges injury to her rotator cuffs. The rotator cuff is a collection of muscles and their tendons.[5] It is an internal and thus invisible part of the human body unfamiliar to many, perhaps most, jurors.

¶ 15 Further complicating the mechanism of causation is the fact that Morgan had a history of neck, back, and shoulder issues stemming at least from her 1998 car accident. In 1999 she reported bilateral arm numbness, shoulder pain, neck pain, and headaches. Similar symptoms were present in 2001. By January 2003, her neck pain had increased, followed by numbness radiating down her left arm to her fingers. She had begun losing strength in her left arm. She demonstrated a "reasonably good range of motion" in both shoulders, but did experience "mild pain in the shoulders" with range of motion. After the 2003 surgery and hospital stay, including the incident at issue in this case, Morgan experienced loss of both right and left rotation and marked increase in shoulder pain and a rotator cuff tear.

¶ 16 On this record, determining proximate cause is unlike determining whether the patient in *Bowman* was killed by the falling dresser. Without expert testimony, a jury of laypersons could not be expected to sift through this medical evidence and make a reliable finding of proximate cause. Indeed, even Morgan's treating physician, with his knowledge of the physiology of rotator cuffs in general and Morgan's rotator cuffs in particular, was unable to do so. When asked whether the condition of Morgan's shoulder could be the result of either an acute shoulder injury on February 26 or 27, 2003, or a "chronic older tear," he responded, "Sure, could be either." When asked point blank whether he would testify at trial that Morgan's rotator cuff tears were related to the incident with the Nurse, Dr. Warner responded equivocally: "I mean, if somebody grabbed her arms and jerked them up, then could that have caused this? It's possible, yes."

¶ 17 Medical evidence that it is "possible" that a plaintiff's condition was caused by an event is insufficient to survive a motion for directed verdict. *See Beard v. K–Mart Corp.*, 2000 UT App 285, ¶¶ 9–10, 12 P.3d 1015 (citing *Moore v. Denver & Rio Grande W. R.R. Co.*, 4 Utah 2d 255, 292 P.2d 849, 850–51 (Utah 1956) (requiring a limiting instruction stating that expert testimony, which provided that "it was possible" that plaintiff's injury was caused by the accident, was insufficient to establish causation)). We are not persuaded that, without the assistance of medical expert testimony, a lay jury could be expected to reasonably conclude that Dr. Warner's assessment was too timid, and that Morgan's rotator cuff tear was more likely than not caused by the Nurse's actions.

## CONCLUSION

¶ 18 The circumstances surrounding Morgan's injury are sufficiently complicated to require expert medical testimony regarding the element of causation. Because Morgan did not support that element with expert

---

5. "The rotator cuff is a network of four muscles that come together as tendons to form a covering around the head of the humerus. The rotator cuff attaches the humerus to the shoulder blade and helps to lift and rotate your arm." American Academy of Orthopaedic Surgeons, *Rotator Cuff Tears*, http://orthoinfo.aaos.org/topic.cfm?topic=a 00064 (last visited July 1, 2011).

testimony, the trial court did not err in granting summary judgment in favor of IHC. Affirmed.

¶ 19 WE CONCUR: JAMES Z. DAVIS, Presiding Judge and CAROLYN B. McHUGH, Associate Presiding Judge.