**2018 UT App 10**

## THE UTAH COURT OF APPEALS

SHAUNNA LANE, individually and
as the heir of JACKIE ADAMS, deceased,
Appellee and Cross-appellant,
*v.*
PROVO REHABILITATION AND NURSING,
Appellant and Cross-appellee.

Opinion
No. 20160472-CA
Filed January 19, 2018

Fourth District Court, Provo Department
The Honorable Claudia Laycock
No. 100404282

Stephen T. Hester and Bradley M. Strassberg,
Attorneys for Appellant and Cross-appellee

Bradley H. Parker, W. Alexander Evans, and James
W. McConkie, Attorneys for Appellee
and Cross-appellant

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
GREGORY K. ORME and DIANA HAGEN concurred.

HARRIS, Judge:

¶1 While Jackie Adams was a resident at Provo Rehabilitation and Nursing (Provo Rehab), a residential nursing facility, a nurse (Nurse) mistakenly gave Adams doses of three potent narcotics that were prescribed for another patient. Nurse then compounded her mistake by not informing anyone about it, thereby depriving Adams of the opportunity to be administered medicine that would likely have reversed the effects of the overdose. Adams later died due to the physiological effects of the overdose. His heir (Plaintiff) filed suit against Provo Rehab and Nurse.

¶2 During the lawsuit, Provo Rehab conceded that Nurse was negligent in giving Adams the wrong medication, and conceded that it was vicariously liable for Nurse's initial mistake. However, Provo Rehab asserted that it was not responsible for Nurse's concealment of her mistake, and that Nurse's knowledge of her mistake could not be imputed to Provo Rehab. Based on these two contentions, Provo Rehab's main defense of the case was its claim that it was Nurse's concealment of her mistake, and not the mistake itself, that proximately caused Adams's death. During pretrial proceedings, the trial court agreed with Provo Rehab that knowledge of Nurse's mistake could not be imputed to Provo Rehab. Based partly on this ruling, the trial court approved a special verdict form that required the jury to decide whether Nurse was acting in the course and scope of her employment when she concealed her mistake, and then potentially to allocate fault as between Nurse's original mistake and her subsequent concealment of the mistake.

¶3 After a three-day trial, the jury determined that Nurse was not acting in the course and scope of her employment when she concealed her mistake, and that therefore Provo Rehab was not vicariously liable for her act of concealment. The jury determined that both Nurse's initial error and her subsequent concealment were causes of Adams's death, and allocated 65% of the fault to the initial medication error and 35% of the fault to the subsequent concealment. The jury also determined that Plaintiff's total damages were $1,407,210.68. The trial court later entered judgment against Provo Rehab for 65% of that amount, plus court costs.

¶4 Both parties appeal from this judgment. Plaintiff argues, among other things, that knowledge of Nurse's mistake should have been imputed to Provo Rehab, and that the jury should therefore never have been asked to apportion fault between Nurse's initial mistake and any concealment. Plaintiff asks us to

vacate the judgment and remand for entry of judgment for the full amount of damages as determined by the jury. Provo Rehab, for its part, argues that Plaintiff failed to introduce sufficient evidence of causation, and that the trial court should have entered a directed verdict in favor of defendants. Provo Rehab asks us to vacate the judgment and remand for entry of a no-cause judgment.

¶5 For the reasons discussed herein, we conclude that knowledge of Nurse's medication error should have properly been imputed to her employer, Provo Rehab. It follows from this conclusion that there was no "concealment," at least not from Provo Rehab, given that Provo Rehab is deemed to have known about the error from the outset, and that therefore the jury should not have been asked to apportion fault between the medication error and any concealment. It also follows from this conclusion that Plaintiff's evidence of proximate causation—that the initial medication error set in motion an unbroken chain of events that led to Adams's death—was easily sufficient. We therefore vacate the judgment, and remand this case to the trial court for entry of judgment for the full amount of damages as determined by the jury.

BACKGROUND

¶6 On the evening of February 8, 2010, Nurse worked a six-hour swing shift as a licensed practical nurse at Provo Rehab, a residential nursing facility in Provo, Utah. During this time period, Nurse was one of Provo Rehab's many employees, and worked occasional shifts as a nurse there. On one previous occasion, Nurse had been involved in an incident in which one narcotic pill ended up unaccounted for at the end of her shift, and Nurse was informed that if something like that ever happened again, she would be terminated.

¶7     By February 2010, Adams had resided at, and been under the care of, Provo Rehab for approximately eleven months. He was in his early seventies and had been suffering from a number of medical conditions, including congestive heart failure, diabetes, and obesity, and had been having a hard time at home. He and his family had hoped that, during his stay at Provo Rehab, he could "get stronger" and "get his weight under control."

¶8     Upon arriving at work on February 8, 2010, Nurse consulted an assignment board and learned that she would spend the evening attending to the residents in the hallway in which Adams resided. Part of her job as a nurse was to "pass medication" to the residents in the hall to which she was assigned. These duties included ascertaining which medications were prescribed for which resident, gathering those medications, and administering them timely and in the manner prescribed. If the medication consisted of pills, her duties also included actually counting the pills to make sure that she administered the correct dosages.

¶9     On the evening in question, Nurse began a "medication pass" at about 8:00 p.m., in which she proceeded down her hallway with a movable cart containing the medications she would need to administer. In the course of this "medication pass," Nurse made a crucial mistake: she mixed up Adams's identity with another resident's. When she arrived at Adams's room, she erroneously assumed that another resident, and not Adams, resided there. Based on that mistaken assumption, she prepared the other resident's medications in a "cup of pills" and gave them to Adams, who inquired as to whether his "as-needed" pain medications were in the cup. Both Adams and the other resident had been prescribed pain medications to be administered on an as-needed basis, but the prescribed pain medications were not the same. Nurse told Adams that his pain medications were not in the cup, and Adams asked that he be

given some. Nurse returned to her cart and retrieved the pain medications—three narcotics of varying dosages for which Adams did not have a prescription—that had been prescribed for the other resident, and added them to the cup. Adams took all of the pills in the cup.[1]

¶10   A few minutes later, as she was completing her "medication pass" through the hallway, Nurse noticed that the other resident's name appeared on the door of a different room than the one in which Adams resided. Nurse soon deduced that she had mistakenly provided the other patient's medications to Adams. She also realized that Adams was diabetic, and the other resident was not, so she returned to Adams's room to administer insulin to him. Adams was still awake and lucid at this point, as the narcotics had not yet had time to metabolize. In the course of administering to Adams his diabetes medication, she did not inform him that she had given him the wrong pain medications.

¶11   Over the course of the rest of her shift, Nurse decided to conceal her mistake. She proceeded into the other resident's room and administered to him the narcotics that had been prescribed for Adams. She also checked on Adams "at least twice" over the course of the rest of her shift, and nothing appeared acutely amiss. Before her shift ended, Nurse falsified the medical records so that they indicated that both Adams and the other resident had been given their proper medications. Nurse testified that, at the time, she did not think administering the incorrect medications would cause harm to either Adams or the other resident. In addition, Nurse testified that, given her past employment history including the previous lost-pill incident, she was concerned that she might be terminated if she informed anyone of her mistake. Nurse's shift ended around

---

1. The parties refer to this sequence of events as the Medication Error.

midnight, and she informed no one of the Medication Error before completing her shift.[2]

¶12   The three narcotics that Nurse mistakenly administered to Adams were morphine, hydromorphone, and oxycodone, three "very potent" opioids. By contrast, the only pain medications for which Adams had a prescription—and which he should have been given—were Neurontin, which is not an opioid, and Norco, a less-potent opioid similar to Lortab. Individuals who are not conditioned to taking strong opioid medications are more prone to suffer acute negative effects, including respiratory depression and cardiac arrest. Because Adams had not been prescribed these three potent opioid medications, both parties' experts agreed that he was not conditioned to them. Indeed, one expert referred to Adams as an "opiate-naïve" individual who was more likely than others to suffer negative effects from a mistaken overdose of narcotics.

¶13   However, even unconditioned individuals who have taken an overdose of narcotics can be administered another medication—known generically as naloxone—which, if timely administered, will almost always reverse even severe physiological effects of a narcotics overdose. Neither side disputes the fact that Nurse's decision to conceal the Medication Error deprived Adams of an opportunity to be saved from the Medication Error through the timely administration of naloxone.

¶14   At approximately 5:45 a.m. the next morning, Adams was discovered "not breathing" and "unresponsive." He had no pulse. At that point, Adams was taken to a hospital but, despite aggressive treatment, he died two days later without ever regaining consciousness.

---

2. The parties refer to this sequence of events as the Concealment.

¶15   Plaintiff filed suit against Provo Rehab and Nurse,[3] alleging that both Provo Rehab and Nurse owed Plaintiff a duty of care and that both defendants breached that duty, causing Adams's death and Plaintiff's damages. Plaintiff also brought claims against Provo Rehab and Nurse under the wrongful death statute and the survival statute. During pretrial proceedings, Provo Rehab conceded that Nurse acted negligently by committing the Medication Error, and further conceded that it was vicariously liable for Nurse's actions in committing the Medication Error, because Nurse was clearly acting in the course and scope of her employment in administering the medications. However, Provo Rehab took the position that Nurse was not acting in the course and scope of her employment when she chose to conceal the Medication Error from Adams and from her superiors, and contended that it was therefore not vicariously liable for Nurse's Concealment.

¶16   Plaintiff responded to this defense by asking the trial court to determine, as a matter of law, that knowledge of Nurse's Medication Error was imputed to Provo Rehab, because Nurse committed the Medication Error during the course and scope of her employment with Provo Rehab, and therefore Provo Rehab had knowledge of the Medication Error pursuant to principles of agency law. Plaintiff argued that, if knowledge of the Medication Error was imputed to Provo Rehab at the moment it occurred, there could not have been any "concealment," at least not from Provo Rehab. Had the trial court granted this motion, it would have prevented Provo Rehab from pursuing any defense based on Nurse's Concealment. Indeed, at oral argument before this court, Provo Rehab conceded that, if knowledge of the Medication Error is imputed to it, it effectively has no defense to Plaintiff's lawsuit. The trial court denied the motion, however,

---

3. Nurse has since been dismissed as a defendant, and is not a party to this appeal.

effectively allowing Provo Rehab's concealment defense to continue.[4]

¶17    The trial court also approved the use of a special verdict form that contained seven questions. First, the jury was asked to determine whether Nurse was "acting in the course and scope of her employment . . . when she concealed her medication error." Next, in two questions, the jury was asked to determine, in turn, whether the Medication Error and the Concealment were "a cause" of Adams's death. After that, the jury was asked, in two questions, to apportion fault between the Medication Error and the Concealment. Finally, the jury was asked, in two questions, to fix an amount for Plaintiff's economic and non-economic damages.

¶18    During trial, both parties' medical experts were in general agreement on two main points. First, both agreed that Adams died as a result of receiving the three narcotics from Nurse that were prescribed for the other resident. Second, both experts likewise agreed that had Adams timely been administered naloxone, he likely would not have died. However, Plaintiff's expert had not been asked to consider, and therefore did not

---

4. After the trial court denied Plaintiff's motion to impute, and partially because of that ruling, the trial court also granted Provo Rehab's motion for summary judgment on Plaintiff's direct claims against it, concluding, among other things, that Provo Rehab did not breach the standard of care when it failed to disclose the Medication Error to Adams because—due to the trial court's previous ruling regarding imputation—Provo Rehab did not know of the Medication Error until it was too late. Although Plaintiff here appeals the trial court's ruling regarding imputation of knowledge, Plaintiff does not appeal the trial court's related ruling dismissing her direct claims against Provo Rehab on summary judgment.

offer an opinion on, whether the Medication Error alone, apart from the Concealment, was the proximate cause of Adams's death. Provo Rehab's expert, on the other hand, testified that, while the Medication Error was a "but-for" cause of Adams's death, the proximate cause of the death was the Concealment.

¶19　At the close of evidence, Provo Rehab moved for a directed verdict, asserting that Plaintiff had failed to meet her burden of presenting expert testimony that the Medication Error—as opposed to the Concealment—was the proximate cause of Adams's death. The trial court denied the motion. During closing arguments, Provo Rehab's counsel again argued that Nurse's Concealment, not the Medication Error, caused Adams's death, and pointed out that both experts agreed that Adams would have lived if Nurse had appropriately disclosed the Medication Error.

¶20　After deliberation, the jury found that Nurse was not acting in the course and scope of her employment when she concealed the Medication Error. The jury found that both the Medication Error and the Concealment were causes of Adams's death, and apportioned 65% of the fault to the Medication Error and 35% to the Concealment. The jury awarded Plaintiff $1,375,000 in loss-of-companionship damages and $32,210.68 in medical and funeral expenses, for a total of $1,407,210.68. The trial court later entered judgment against Provo Rehab for 65% of that amount, plus court costs.

¶21　After trial, Provo Rehab moved for a judgment notwithstanding the verdict, or alternatively for a new trial, making the same lack-of-causation arguments it had made in its motion for directed verdict. The trial court denied the motion.

¶22　Both parties appeal.

ISSUES AND STANDARDS OF REVIEW

¶23    Plaintiff argues, first, that the trial court should have granted her motion to impute Nurse's knowledge to Provo Rehab, thus foreclosing Provo Rehab's defense at trial that Nurse's Concealment of the Medication Error was a cause of Adams's death. Whether a principal is imputed with its agent's knowledge is a legal question. *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 19, 61 P.3d 1009. And we review a trial court's conclusions on legal questions for correctness. *Zions Gate R.V. Resort, LLC v. Oliphant*, 2014 UT App 98, ¶ 4, 326 P.3d 118.

¶24    Second, and relatedly, Plaintiff argues that the trial court should not have instructed the jury to allocate fault between the Medication Error and the subsequent Concealment. We review for correctness a trial court's decisions about whether to allow apportionment of fault. *Call v. Keiter*, 2010 UT App 55, ¶ 15, 230 P.3d 128.

¶25    Provo Rehab's arguments on appeal all hinge on one assertion: that Plaintiff failed to present sufficient evidence of proximate causation because Plaintiff's expert could not testify that the Medication Error, separate from the Concealment, caused Adams's death. Specifically, Provo Rehab argues that the trial court should have recognized that Plaintiff's case was deficient with regard to causation, and should have granted its motions for directed verdict and/or for judgment notwithstanding the verdict.

> When a party challenges a trial court's denial of a motion for directed verdict or judgment notwithstanding the verdict on the basis of insufficiency of the evidence, we follow one standard of review: We reverse only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict.

*Schreib v. Whitmer*, 2016 UT App 61, ¶ 28, 370 P.3d 955 (citation and internal quotation marks omitted).

ANALYSIS

I

¶26    Plaintiff first argues that the trial court should have granted her motion to impute Nurse's knowledge of the Medication Error to Provo Rehab. We agree.

¶27    Provo Rehab is a corporate entity. "Corporations can only act through agents, be they officers or employees." *Orlob v. Wasatch Mgmt.*, 2001 UT App 287, ¶ 18, 33 P.3d 1078 (citation and internal quotation marks omitted); *see also* Restatement (Third) of Agency § 7.03 cmt. c (Am. Law Inst. 2006) ("A principal that is not an individual can take action only through its agents, who typically are individuals."). Similarly, "corporations, being artificial legal entities, can have only that knowledge which is imputed to them under principles of agency law." *See Wardley*, 2002 UT 99, ¶ 22 (citing 9A *Fletcher Cyclopedia of Private Corporations* § 4589 (perm. ed., rev. vol. 2000)); *id.* (stating that "a corporation's knowledge is entirely imputed to it from the knowledge possessed by its officers and agents" (citation and internal quotation marks omitted)).

¶28    Pursuant to agency law, the general rule is that "the knowledge of [an] agent concerning the business which he is transacting for his principal is to be imputed to his principal." *Id.* ¶ 16 (alteration in original) (citation and internal quotation marks omitted); *see also* Restatement (Third) of Agency § 5.03 (Am. Law Inst. 2006) (stating that "notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal"). "This rule is broad, encompassing '*all notice or knowledge* relating to the subject-matter of the agency which the

agent obtains while acting as such agent and within the scope of his authority.'" *Wardley*, 2002 UT 99, ¶ 16 (quoting *Latses v. Nick Floor, Inc.*, 104 P.2d 619, 623 (Utah 1940)). Indeed, this rule applies even where the agent fails to inform his principal of the fact in question:

> [A] principal is affected with constructive knowledge, regardless of actual knowledge, of *all material facts* of which his agent receives notice or acquires knowledge while acting in the course and scope of his employment and within the scope of his authority, *although the agent does not in fact inform his principal thereof.*

*Id.* (second emphasis added) (citing 3 C.J.S. *Agency* § 432 (1973)).

¶29 Provo Rehab has long since conceded that Nurse was its agent, and that Nurse was acting in the course and scope of her employment and within the scope of her authority when she committed the Medication Error. Under general principles of agency law, then, all of Nurse's knowledge that was material to her work for Provo Rehab—even knowledge of facts that Nurse did not share with her superiors—is automatically imputed to Provo Rehab, including Nurse's knowledge that, at approximately 8:00 p.m. on February 8, 2010, Nurse administered the wrong medication to Adams.

¶30 Provo Rehab argued to the trial court, and argues here, that these general principles of agency law are not applicable in this case under the Utah Supreme Court's holding in *Wardley*. Provo Rehab's reliance upon *Wardley*, however, is misplaced.

¶31 In *Wardley*, a real estate agent fraudulently altered four listing agreements to surreptitiously extend their duration. *See Wardley*, 2002 UT 99, ¶ 2. After the properties that were the subject of the agreements were sold, the agent and his brokerage claimed entitlement to a commission. *Id.* ¶ 5. The owners

disagreed, pointing out that the listing agreements they signed expired before the properties were sold. *See id.* The brokerage sued the owners for breach of contract. *Id.* At the time the suit was filed, the agent knew that he had fraudulently altered the contracts, but his superiors at the brokerage who made the decision to file suit apparently did not. *Id.* ¶¶ 6, 8. The case proceeded to trial, and the trial court ruled in favor of the owners, finding that the agent had fraudulently altered the listing agreements. *Id.* ¶ 6. After trial, the owners asked the trial court to award attorney fees under the "bad faith" statute, which permits a trial court to award fees "if the court determines that the action . . . was without merit and not brought or asserted in good faith." *Id.* ¶ 7. The trial court denied the motion, ruling that because the brokerage "represented that it did not have knowledge" of the agent's fraudulent acts at the time it filed suit, the case was not brought in bad faith, and this court affirmed the trial court's decision. *Id.* ¶¶ 8, 10–11 (internal quotation marks omitted).

¶32    The Utah Supreme Court reversed, ultimately ruling that knowledge of the agent's fraudulent actions could be imputed to the agent's principals at the brokerage. *Id.* ¶ 33. In reaching this conclusion, the court discussed the distinctions between the concepts of vicarious liability, on the one hand, and imputation of knowledge, on the other hand. *Id.* ¶ 19 (referring to the two concepts as "separate legal questions"). The court explained that imputation of knowledge is a *broader* concept than vicarious liability, and that an agent's knowledge is imputed to its principal in many contexts, not just when vicarious liability is at issue. *Id.* ¶ 20 (stating that "[i]f we were to impute an agent's knowledge to his principal only when the principal is being sought to account for his agent's acts, imputation of knowledge would be a wholly superfluous legal principle because in each instance in which it might apply, the principal could simply be held responsible by means of vicarious liability" (emphasis omitted)).

¶33    Provo Rehab relies heavily on one particular quotation from *Wardley* in which the court stated as follows:

> *Under principles of imputation, a principal is held responsible for his own act*, which is deemed to have been committed with the knowledge his agent had at the time of the principal's act, assuming the agent obtained such knowledge while acting within the scope of his authority.

*Id.* ¶ 19 (emphasis added). Provo Rehab argues that imputation of knowledge must necessarily be limited to only one context: where a litigant is attempting to hold a principal "responsible for his own act." Provo Rehab asserts that there is no "act" that was committed by Provo Rehab for which Plaintiff is attempting to hold it liable,[5] and asserts that Nurse's knowledge may therefore not be imputed to it. We find these arguments unpersuasive.

¶34    *Wardley* certainly applied the concept of imputation of knowledge to a set of facts in which a plaintiff was attempting to hold a principal directly liable for its own actions (there, allegedly filing suit in bad faith). But *Wardley* came nowhere close to limiting the applicability of the concept of imputation of knowledge to that solitary factual setting. Indeed, *Wardley* discussed at least one prior case—*Hodges v. Gibson Products Co.*, 811 P.2d 151 (Utah 1991)—in which the concept was properly

---

5. As noted earlier, at one point in the case Plaintiff did allege that Provo Rehab directly (and not vicariously) committed an act (namely, failing to tell Adams about the Medication Error after it happened) for which it should be held liable based on imputed knowledge. As noted, all such direct claims were dismissed on summary judgment, partially as a result of the trial court's imputation ruling, and Plaintiff does not appeal the dismissal of her direct claims.

applied in a case alleging vicarious (as opposed to direct) liability. *Id.* ¶ 20 (citing *Hodges*, 811 P.2d at 157). In our view, Provo Rehab's interpretation of *Wardley* is exactly backwards: rather than *limiting* the concept of imputation of knowledge, what the court in *Wardley* was doing was *extending* the concept to a factual setting—a case alleging direct liability—in which the court had apparently not previously applied it. Nothing in the *Wardley* opinion can be construed as limiting or overruling the concept's applicability in factual settings in which it had already been applied.

¶35 And those factual settings are quite numerous. Plaintiff directs our attention to numerous prior cases, some of which are cited here in the margin,[6] in which our supreme court has applied the concept of imputation of knowledge from agent to principal in a variety of circumstances. In two of these cases, the court imputed knowledge from agent to principal in a factual setting similar to the one presented here: where a litigant was attempting to impute knowledge to the principal in order to foreclose a principal's claim or affirmative defense. *See Macris v.*

---

6. *See, e.g.*, *Hardy v. Prudential Ins. Co. of Am.*, 763 P.2d 761, 767 (Utah 1988) (holding that an insurance agent's knowledge of an insured's medical history would be imputed to the principal insurance company in an insurance coverage dispute); *Harris-Dudley Plumbing Co. v. Professional United World Travel Ass'n (WTA), Inc.*, 592 P.2d 586, 588–89 (Utah 1979) (holding that a company officer's knowledge of the commencement of an action would be imputed to the company); *Evona Inv. Co. v. Brummitt*, 240 P. 1105, 1112 (Utah 1925) (concluding that an agent's knowledge would be imputed to the principal in a breach of promissory note case); *First Nat'l Bank v. Foote*, 42 P. 205, 206–07 (Utah Terr. 1895) (acknowledging the general rule that an agent's knowledge is imputed to his principal when the agent is acting on behalf of the principal and has authority to do so).

*Sculptured Software, Inc.*, 2001 UT 43, ¶ 21, 24 P.3d 984 (imputing knowledge from agent to principal to determine that the principal's lawsuit was barred by the statute of limitations, since the agent was aware of the relevant facts earlier); *Latses v. Nick Floor, Inc.*, 104 P.2d 619, 622–24 (Utah 1940) (imputing knowledge from agent to principal to determine that the principal would not be allowed to assert a statute of frauds defense). Here, Plaintiff wishes to impute Nurse's knowledge of the Medication Error to Provo Rehab in order to prevent Provo Rehab from arguing that there was a separate act of "Concealment" that proximately caused Adams's death. We are aware of no principle of law—certainly, none is found in *Wardley*—that would prevent imputation of knowledge under these circumstances.

¶36   Imputation of knowledge from agent to principal is a broad concept, and "encompass[es] '*all notice or knowledge relating to the subject-matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority.*'" *Wardley*, 2002 UT 99, ¶ 16 (quoting *Latses*, 104 P.2d at 623). Nurse committed the Medication Error within the course and scope of her agency. Knowledge of that error was, as a matter of law, necessarily imputed to Nurse's principal, Provo Rehab, the moment it occurred. Accordingly, the trial court's decision not to impute that knowledge to Provo Rehab was error.

II

¶37   The conclusion that Provo Rehab had constructive knowledge, as a matter of law, of the Medication Error the moment it happened means, as a matter of logic, that there cannot have been any concealment of the Medication Error from Provo Rehab. This fact has several important consequences in this case.

A

¶38    First, Provo Rehab's efforts to defend this case on the ground that the Concealment, rather than the Medication Error, proximately caused Adams's death must fail for the simple reason that there was no concealment of the Medication Error from Provo Rehab. While the Medication Error was certainly concealed from Adams and his family, it cannot have legally been concealed from Provo Rehab, because Provo Rehab's agent (Nurse) learned of the Medication Error in the course and scope of her employment, and her knowledge was imputed to Provo Rehab. Because there was no concealment from Provo Rehab, there was no legal or factual basis for allocating fault as between the Medication Error and the Concealment. Accordingly, the trial court's instruction to the jury that it should attempt that allocation was erroneous.

B

¶39    Second, Provo Rehab's assertion that Plaintiff failed to present sufficient evidence of proximate causation is incorrect. Provo Rehab's arguments in this regard are grounded in the fact that both sides' expert medical witnesses—including Plaintiff's expert—testified that Adams would not have died if he had timely been given naloxone. As Provo Rehab puts it, Plaintiff was unable to present any competent expert testimony that the Medication Error, standing alone and apart from the Concealment, proximately caused Adams's death.

¶40    This argument collapses, however, once it is acknowledged that there was never any "concealment" in a legal sense. Without any concealment, the causation question becomes much simpler: did the Medication Error proximately cause Adams's death? And the answer to this question was undoubtedly answered in the affirmative by expert medical witnesses from both sides.

¶41 In order to prevail on a claim of medical malpractice, Plaintiff must establish "(1) the standard of care required of health care providers under the circumstances; (2) breach of that standard by the defendant; (3) injury proximately caused by the breach; and (4) damages." *Morgan v. Intermountain Health Care, Inc.*, 2011 UT App 253, ¶ 8, 263 P.3d 405. Ordinarily, proximate cause in a medical malpractice case must be established through expert testimony. *Id.* ¶ 9. This is because "'the standard of care and the causal link between the negligence and the injury'" in a medical malpractice case "'are usually not within the common knowledge of the lay juror.'" *Id.* (quoting *Bowman v. Kalm*, 2008 UT 9, ¶ 7, 179 P.3d 754); *see also Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 96, 82 P.3d 1076 ("Unless the propriety of the treatment received is within the common knowledge and experience of the layman, the plaintiff is required to prove the standard of care through an expert witness who is qualified to testify about the standard." (citation and internal quotation marks omitted)). Provo Rehab correctly points out that Plaintiff was required to present expert medical testimony that Adams's death was proximately caused by a breach of the medical standard of care.

¶42 Provo Rehab also correctly points out that proximate causation is not the same thing as "but-for" causation, and that the expert testimony on causation must establish more than simply that, but for the Medication Error, Adams would not have died. *See Raab v. Utah Ry. Co.*, 2009 UT 61, ¶ 23, 221 P.3d 219 (stating that "[f]or a particular negligent act to be the legal cause of a plaintiff's injuries, there must be some greater level of connection between the act and the injury than mere 'but for' causation"). In order to meet the elements of medical malpractice, Plaintiff's expert medical testimony on causation must establish that the Medication Error was the "proximate cause" of Adams's death. *See Morgan*, 2011 UT App 253, ¶ 8.

¶43 We have defined "[p]roximate cause" as "'that cause which, in a natural and continuous sequence, *unbroken by any new*

*cause*, produced the injury, and without which the injury would not have occurred.'" *Dee v. Johnson*, 2012 UT App 237, ¶ 4, 286 P.3d 22 (emphasis added) (quoting *Bunker v. Union Pac. R.R. Co.*, 114 P. 764, 775 (Utah 1911)); *see also* Model Utah Jury Instructions 2d (MUJI) CV209 (2016), https://www.utcourts.gov/resources/ muji/inc_list.asp?action=showRule&id=2#209 [https://perma.cc/ BE3B-2ZDB] (stating that the first element of "cause" is that "the person's act or failure to act produced the harm directly or set in motion events that produced the harm in a natural and continuous sequence"). Additionally, "'foreseeability is an element of proximate cause.'" *Dee*, 2012 UT App 237, ¶ 5 (quoting *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1346 (Utah 1993)); *see also* MUJI CV209 (stating that the second element of "cause" is that "the person's act or failure to act could be foreseen by a reasonable person to produce a harm of the same general nature"). "Therefore, 'the more fundamental test is whether under the particular circumstances the defendant should have foreseen that his conduct would have exposed others to an unreasonable risk of harm; and this includes situations where negligent or other wrongful conduct of others should reasonably be anticipated.'" *Dee*, 2012 UT App 237, ¶ 5 (brackets omitted) (quoting *Watters v. Querry*, 588 P.2d 702, 704 (Utah 1978)).

¶44 Under these standards, and in the absence of any Concealment, we have no trouble concluding that the expert medical testimony presented at trial was more than sufficient to establish that the Medication Error was a proximate cause of Adams's death. Both parties' experts agreed that an overdose of narcotics, such as those mistakenly administered to Adams, sets in motion a chain of events that will, if not halted by the timely administration of naloxone, very likely cause respiratory failure and death. Specifically as to this case, both parties' experts agreed that the Medication Error had precisely these effects upon Adams: that it set in motion a chain of events that shut down Adams's respiratory system and ultimately led to his

death. That testimony was easily sufficient to allow the case to go to the jury on the issue of proximate causation.[7] Accordingly, the trial court did not err in denying Provo Rehab's various post-trial motions.

C

¶45    Finally, we briefly discuss the issue of damages. Neither side raises any issues on appeal with regard to the propriety of the evidence presented to the jury regarding damages. That is, neither side calls into question the jury's determination, after hearing the damages evidence, that Plaintiff's total damages were $1,407,210.68.

---

7. Provo Rehab did not make any argument, either at trial or before this court, that the failure to administer naloxone was a superseding cause of Adams's death. Presumably, this choice was tactical. Indeed, the related argument that it advanced instead—that the Concealment and not the Medication Error was the true cause of Adams's death—was at least partially successful at trial. However, we note here that we perceive potential substantive deficiencies in any argument Provo Rehab might have made that the failure to administer naloxone to Adams was a superseding cause of Adams's death. The failure to administer naloxone was Provo Rehab's own failure (or the failure of its agents). A defendant "cannot rely on its own subsequent acts of negligence to break the chain of causation between an earlier act of negligence and the injury"; indeed, "[o]nly the unforeseeable acts of *another* constitute an intervening proximate cause." *See Steffensen v. Smith's Mgmt. Corp.*, 820 P.2d 482, 488 (Utah Ct. App. 1991) (emphasis added), *aff'd*, 862 P.2d 1342 (Utah 1993). Here, there is no second actor; thus, Provo Rehab's and/or its agents' failure to administer naloxone cannot have been a superseding cause of Adams's death.

¶46   In some cases in which we discern error in the manner in which a trial was conducted, it is necessary to remand the case for a new trial. In this case, given that neither party takes issue with the damages evidence, a full remand is not necessary. We have determined that the imputation of the knowledge of Nurse's Medication Error to Provo Rehab means that there was no proper basis for the jury to be asked to allocate fault—and thus portions of the total damages award—between the Medication Error and the Concealment. Plaintiff's suggested remedy is simply for us to vacate the judgment (which was entered for approximately 65% of the full damages amount) and remand the case for the limited purpose of entry of judgment in the full, non-allocated amount of damages awarded by the jury, plus appropriate costs. On the facts of this case, we agree that this is the proper remedy.[8]

CONCLUSION

¶47   Adams and his family entrusted his care to Provo Rehab. While under the care of Provo Rehab, Adams was mistakenly given an overdose of narcotics, and that mistake was not ameliorated through the timely administration of naloxone. These events led inexorably to Adams's death, and Provo Rehab is appropriately liable for damages resulting therefrom.

---

8. Plaintiff also raises several other arguments on appeal, including (1) that the trial court should have ruled that Provo Rehab ratified Nurse's actions by accepting payment for his care, and (2) that Provo Rehab failed to provide the jury with any rational basis for dividing responsibility for Adams's death between the Medication Error and the Concealment. Given our resolution of the issues discussed herein, we need not address these alternative arguments.

¶48 Provo Rehab's efforts to avoid full liability here are unavailing, largely because knowledge of Nurse's Medication Error was imputed, as a matter of law, to Provo Rehab the moment it happened. As a result, Provo Rehab cannot point to any concealment as the cause of Adams's death, because there was no concealment from Provo Rehab as a matter of law, and therefore no basis for apportioning fault between the Medication Error and the Concealment. In the absence of any concealment, Plaintiff's expert medical evidence regarding causation was sufficient.

¶49 Accordingly, we vacate the judgment of the trial court, and remand this case for the limited purpose of entering judgment in the full amount of damages awarded by the jury, plus appropriate costs.

—————